**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal Action No. 21-642 (JDB)** |
| **DARRELL NEELY,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Defendant Darrell Neely is charged via indictment with six offenses related to the breach of the U.S. Capitol on January 6, 2021.  Indictment [ECF No. 61].  Before the Court are six motions filed by Neely seeking dismissal, further discovery, a change in venue, and suppression of evidence.  The Court will deny each motion for the reasons explained below.

**Background**

On January 6, 2021, the U.S. Congress was convened in the Capitol for a joint session to certify the vote count from the November 2020 presidential election.  Statement of Facts [ECF No. 1-1] at 1.  The Capitol was closed to the public, and the U.S. Capitol Police had erected temporary and permanent barricades around the exterior of the Capitol.  Id.  A large crowd was gathered outside the barricades, and around 2:00 p.m. members of the crowd violently forced their way into the Capitol, past officers of the U.S. Capitol Police and over barricades.  Id.  Shortly after, members of the U.S. House of Representatives and U.S. Senate, as well as then-Vice President Michael Pence, were forced to evacuate and effectively suspend the joint session.  Id.; see also United States v. McHugh, 583 F. Supp. 3d 1, 7–9 (D.D.C. 2022) (further describing the violence and destruction on January 6).

A few days after January 6, the FBI received a tip that Neely was among the crowd of people who forced their way into the Capitol on January 6.  Statement of Facts at 2.  The FBI then

1

identified Neely in video footage from the Capitol and interviewed witnesses who had communicated with Neely about his participation in the Capitol riot.  Id. at 2–3.  Neely has a streaming radio show called the "Global Enlightenment Radio Network."  Mot. to Dismiss Information [ECF No. 31] ("Mot. to Dismiss Case") at 2.  The government reports that in the days following January 6, Neely broadcast his radio show wearing a U.S. Capitol Police baseball cap. Statements of Facts at 4.

Based on these facts and others, the government filed a criminal information against Neely on October 22, 2021, charging him with five counts: theft of government property, in violation of 18 U.S.C. § 641 (Count One); entering and remaining in a restricted building, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); disorderly and disruptive conduct in a restricted building, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); violent entry and disorderly conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).  See Information [ECF No. 9].

On August 8, 2022, Neely filed a number of motions[1] in this case: a motion to suppress his statements given to FBI agents in an interview in violation of Miranda v. Arizona, 384 U.S. 436 (1966), Def.'s Mot. to Suppress Statements & Evidence [ECF No. 27] ("Mot. to Suppress"); a motion to change venue, Def.'s Mot. to Transfer Venue & Mem. of P. & A. in Supp. [ECF No. 28] ("Venue Mot."); a motion to compel access to nonpublic areas of the Capitol, Def.'s Mot. to Compel Access to Non-Public Areas of the Capitol [ECF No. 29] ("Mot. to Compel Access"); a motion to dismiss Counts 2 and 3, Def.'s Mot. to Dismiss Counts of the Information [ECF No. 30] ("Mot. to Dismiss Counts Two & Three"); a motion to dismiss the entire case, Mot. to Dismiss

---

[1] This Memorandum Opinion does not address the two motions in limine Neely filed on August 8, 2022.

Case; and a motion to order the government to retain rough notes, Mot. to Retain Rough Notes & Emails [ECF No. 32] ("Mot. to Retain Rough Notes").  The government responded in opposition to each motion, and Neely did not file any replies.  See Notice of Filing [ECF No. 59].

This case then took a bit of a turn.  In late August, the Pretrial Services Agency ("PSA") notified the Court that Neely had left Washington, D.C. in violation of his conditions of pretrial release and PSA was unable to contact him.  See Pretrial Violation Report [ECF No. 46] at 2.  This unapproved travel set off a series of motions and hearings as to Neely's whereabouts, which ultimately concluded with the Court ordering Neely's arrest on September 21, 2022.  Sept. 21, 2022 Min. Entry.  Neely was arrested in North Carolina shortly thereafter, and the government filed a superseding indictment on October 12, 2022.  See Indictment.  The new indictment included each of his original charges and added one count—civil disorder and aiding and abetting, in violation of 18 U.S.C. § 641.  Id. at 1–2.  Neely was arraigned on the superseding indictment on October 24, 2021 and ordered detained pending trial.  See Oct. 24, 2022 Min. Entry; Pretrial Detention Order [ECF No. 63].  His trial—which was initially scheduled to begin on October 5, 2022—was moved to May 22, 2023.  See Oct. 24, 2022 Min. Entry.  The Court gave the parties an opportunity to file additional motions or to supplement the motions filed on August 8, 2022, and Neely filed an amended motion to transfer venue.  See Def.'s Am. Mot. to Transfer Venue & Mem. of P. & A. in Supp. [ECF No. 65] ("Am. Venue Mot.").  All six motions are now ripe for the Court's decision.

## Motions to Dismiss

Neely filed two motions to dismiss.  The first asks the Court to dismiss Counts Two and Three of the indictment, which charge Neely with violations of 18 U.S.C. § 1752.  See Mot. to Dismiss Counts Two & Three.  The second seeks dismissal of the entire cased based on an internal Department of Justice Policy.  See Mot. to Dismiss Case.

3

As an initial matter, when the motions were filed, Neely had only been charged by an information.  After the motions were fully briefed, the government filed a superseding indictment.  The Court will treat the motions as seeking dismissal of counts in the superseding indictment, as it is the operative charging document in this case.

The main purpose of a criminal information or indictment is "to inform the defendant of the nature of the accusation against him."  United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (quoting Russell v. United States, 369 U.S. 749, 767 (1962)); see also United States v. Henderson, 121 F.2d 75, 78 (D.C. Cir. 1941) (noting that an information or indictment that "apprise[s] the accused, with reasonable certainty, of the nature of the accusation against him" is sufficient).  Under Federal Rule of Criminal Procedure 7(c)(1), the indictment need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged."

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant in a criminal case may move to dismiss the indictment against him for "failure to state an offense."  Relevant here, if the statutory provision at issue does not cover the charged offense, the indictment "fail[s] to state an offense."  See McHugh, 583 F. Supp. 3d at 10 (citing United States v. Montgomery, 578 F. Supp. 3d 54, 59 (D.D.C. 2021)).  And "if a statute is unconstitutional, the charges based on that statute must be dismissed."  United States v. Sheppard, Crim. A. No. 21-203 (JDB), 2022 WL 17978837, at *2 (D.D.C. Dec. 28, 2022).  In assessing whether to grant a motion to dismiss an indictment under Rule 12(b)(3)(B)(v), a court "presume[s] the allegations of the indictment to be true" and asks whether the allegations "would be sufficient to permit a jury to find that the crimes charged were committed."  United States v. Sanford, Ltd., 859 F. Supp. 2d 102, 107 (D.D.C. 2012) (internal quotation marks omitted).

**A.  Motion to Dismiss Counts Two and Three**

In his motion to dismiss Counts Two and Three, Neely makes a series of arguments as to why § 1752 does not apply to the alleged conduct or, if it does, why the statute is unconstitutional. See Mot. to Dismiss Counts Two & Three at 14–29.  In response, the government argues that § 1752 covers the alleged conduct, see Resp. to Mot. to Dismiss Counts Two & Three [ECF No. 37] at 6–9, 11–16, that § 1752 is constitutional, see id. at 10–11, and that each of Neely's arguments has previously been considered and rejected by multiple courts—including this Court, id. at 1–2.  The government is correct.

Neely is charged with violating 18 U.S.C. § 1752(a)(1) and (2).  Indictment at 2–3.  In relevant part, § 1752 prohibits "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so," 18 U.S.C. § 1752(a)(1), and "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions," id. § 1752(a)(2).  As relevant here, the statute defines "restricted building or grounds" as "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  Id. § 1752(c).

Neely joins the chorus of January 6 defendants who have argued that for a restricted area to fall under the statutory definition, the Secret Service must have been the agency that took the action to physically restrict the area.  See Mot. to Dismiss Counts Two & Three at 14–18.  Courts have consistently rejected these arguments.  See, e.g., United States v. Bozell, Case No. 21-CR-216 (JDB), 2022 WL 474144, at *8–9 (D.D.C. Feb. 16, 2022) (rejecting this argument and citing other courts that have also done so).  To understand why Neely's argument has failed to persuade

a single court, one need only read the plain text of § 1752(c), which "says nothing about <u>who</u> must do the restricting."  <u>Id.</u> at *8 (quoting <u>McHugh</u>, 583 F. Supp. 3d at 30 (emphasis added)).  As this Court concluded in <u>Bozell</u>, <u>see</u> 2022 WL 474144, at *8–9, and <u>McHugh</u>, <u>see</u> 583 F. Supp. 3d at 29–32, § 1752 contains no requirement that for an area to be a "restricted building or grounds," the restrictions must be put in place by the Secret Service.

In support, Neely also argues that the Capitol was not a "restricted building or grounds" because neither the President nor any "other person protected by the Secret Service" was "temporarily visiting" the Capitol during the attack.  <u>See</u> Mot. to Dismiss Counts Two & Three at 28–29.  Neely acknowledges that Vice President Pence, who is protected by the Secret Service, was in the Capitol at the relevant times.  <u>Id.</u> at 28.  He argues, however, that Vice President Pence was not "temporarily visiting" the Capitol, as he had a "permanent office" there and it should qualify as his "place of employment."  <u>Id.</u>

In support, Neely cites cases holding that § 1752 covers places that the President and Vice President were visiting for one-off events, such as speaking engagements, which—according to Neely—suggests that visits that happen more regularly are not "temporary" visits.  <u>See</u> Mot. to Dismiss Counts Two & Three at 28–29.  This Court thoroughly analyzed and rejected this argument in <u>McHugh</u> and sees no reason to disturb that decision.  <u>See</u> 583 F. Supp. 3d at 32–35. Briefly, the plain meanings of "temporarily" and "visit" suggest that someone is temporarily visiting a location "if they have gone there for a particular purpose, be it 'business, pleasure, or sight-seeing,' and for a limited time, which could be 'brief' or 'extended' while nonetheless remaining 'temporary.'"  <u>Id.</u> at 33 (quoting <u>Webster's Third New International Dictionary Unabridged</u> (1961)).  Vice President Pence went to the Capitol on January 6 for a particular purpose—to preside over the certification of the Electoral College vote—with the intention to stay there for a brief period of time.  This visit falls under the plain meaning of the statute.  The cases

6

on which Neely relies, which classify rallies and other one-off events as "temporary visits," <u>see,</u> <u>e.g.,</u> <u>United States v. Bursey</u>, 416 F.3d 301, 304 (4th Cir. 2005), have no bearing on whether a visit to one's office could also be considered a "temporary visit."

Even if the Court were to read into the statute an extratextual limitation excluding visits to places the Vice President visits regularly, such as his "permanent office"—which it declines to do—Neely's argument would still fail.  "The U.S. Capitol is not the Vice President's regular workplace, nor was Vice President Pence's trip to the Capitol on January 6, 2021 analogous to a regular commute to the office."  <u>McHugh</u>, 583 F. Supp. 3d at 35.  The Vice President's working office is in the White House, and the U.S. Capitol is one of multiple federal buildings at which the Vice President can maintain an office.  <u>Id.</u> (citing the White House website describing the Vice President's residences and offices).  It is "quite natural to say that a person 'temporarily visits' a place where she has an office," particularly if that office is not where that person works the majority of the time.  <u>United States v. Andries</u>, Crim. A. No. 21-93 (RC), 2022 WL 768684, at *16 (D.D.C. Mar. 14, 2022).  Accordingly, there is no basis to find that Vice President Pence was not "temporarily visiting" the Capitol on January 6.

Neely's constitutional arguments have also been raised and rejected repeatedly.  <u>See, e.g.,</u> <u>Bozell</u>, 2022 WL 474144, at *9.  Neely first argues that § 1752 is unconstitutionally vague because it gives "<u>no</u> notice, much less 'fair notice,' of the conduct proscribed <u>in this case</u>."  Mot. to Dismiss Counts Two & Three at 19 (emphases in original).  His argument appears to be a lite version of his statutory construction argument: even if the Court rules that § 1752 applies in areas protected by agencies other than the Secret Service, an ordinary person would not read the statute that way. <u>See id.</u>  And, the argument continues, because a statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes," <u>United States v. Bronstein</u>, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (internal quotation marks omitted), this purported divergence of

opinion as to the scope of § 1752 is fatal. <u>See</u> Mot. to Dismiss Counts Two & Three at 18–20. But there is no reasonable divergence of opinion. From the plain text, an ordinary person is on notice that § 1752 covers any "restricted area . . . of a building or grounds where . . . [a] person protected by the Secret Service is . . . temporarily visiting." 18 U.S.C. § 1752(c). This unambiguously describes the Capitol on January 6, 2021.[2] <u>See, e.g.</u>, <u>Nordean</u>, 579 F. Supp. 3d at 60 (noting that the "text [of § 1752(c)] is clear and gives fair notice of the conduct it punishes," particularly given that on January 6 "the Capitol grounds were restricted in a highly visible way").

Neely makes one more vagueness argument: that the "boundary" clause of § 1752(a)(2), which prohibits certain activities "in, or <u>within such proximity to</u>, any restricted building or grounds," 18 U.S.C. § 1752(a)(2) (emphasis added), is unconstitutionally vague. Mot. to Dismiss Counts Two & Three at 22–24. Neely cites several cases where courts have found such "boundary" language to be unconstitutional, <u>e.g.</u>, <u>City of Chicago v. Morales</u>, 527 U.S. 41, 59–60 (1999) (holding statute requiring dispersal from "the area" unconstitutionally vague). <u>See</u> Mot. to Dismiss Counts Two & Three at 22–24 (collecting cases). As an initial matter, Neely's motion notes upfront that this argument would only be applicable if the government "alleged that <u>some</u> area within the Capitol Building" was a restricted area and that Neely's conduct was swept into the statute only because he was in proximity to that area. <u>See id.</u> at 22 (emphasis in original). That is not what the government alleges. The government alleges that the Capitol was a restricted building within the meaning of § 1752 and that Neely was in the Capitol. <u>See</u> Indictment at 2 (identifying the "United States Capitol" as the "restricted building" for purposes of § 1752

---

[2] Elsewhere in his motion, Neely argues that the rule of lenity, Mot. to Dismiss Counts Two & Three at 24–25, and the novel construction principle, <u>id.</u> at 25–27, counsel towards resolving ambiguities in the statute in his favor. The Court rejects this argument for the same reason it rejects Neely's vagueness argument: the statute is not ambiguous. <u>See</u> <u>United States v. Griffin</u>, 549 F. Supp. 3d 49, 57–58 (D.D.C. 2021) (explaining that the rule of lenity is a "sort of junior version of the vagueness doctrine" and rejecting lenity and vagueness arguments to § 1752 because the statute is not ambiguous (internal quotation marks omitted)); <u>United States v. Nordean</u>, 579 F. Supp. 3d 28, 60 (D.D.C. 2021) (holding that the novel construction principle applies only when the judicial construction "unexpectedly broadens a statute which on its face had been definite and precise" (internal quotation marks omitted)).

charges); Resp. to Mot. to Dismiss Counts Two & Three at 10–11 ("Defendant was squarely within the Capitol building itself."). Thus, this argument is not applicable. See Nordean, 579 F. Supp. 3d at 60 n.16 ("[T]he First Superseding Indictment alleges that Defendants were in the restricted area . . . . [W]hatever 'fuzzy boundary standard[]' that phrase may introduce is irrelevant here." (emphasis and alterations in original)).

Regardless, Neely's motion takes too simplistic a view of the "boundary" cases and the text of § 1752. It does not grapple with the mens rea element of the statute, which requires him to have acted "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions." 18 U.S.C. §1752(a)(2); see Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 499 (1982) ("[A] scienter requirement may mitigate a law's vagueness . . . ."). Nor does Neely discuss the structure of the statute, which criminalizes "engag[ing] in disorderly or disruptive conduct . . . when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions." 18 U.S.C. § 1752(a)(2). Neely does not argue that the description of the conduct regulated—disorderly conduct that disrupts government business—is vague. He challenges only the phrase "within such proximity to," which merely "describes the outer bounds of where a violation may take place," United States v. Puma, 596 F. Supp. 3d 90, 113 n.6 (D.D.C. 2022) (rejecting same vagueness challenge to § 1752(a)(2)). The motion, therefore, gives the Court no basis to find § 1752(a)(2) unconstitutionally vague.

**B. Motion to Dismiss Entire Indictment**

Neely filed a second motion to dismiss the entire indictment "for violation [of] the Department of Justice's policy regarding arresting or charging members of the news media." Mot. to Dismiss Case at 1. The Department of Justice's regulations include a policy titled: "Policy regarding obtaining information from, or records of, members of the news media; and regarding

questioning, arresting, or charging members of the news media" (the "Policy").  28 C.F.R. § 50.10.

It provides in relevant part:

> No member of the Department shall seek a warrant for an arrest, or conduct an arrest, of a member of the news media for any offense that he or she is suspected of having committed in the course of, or arising out of, newsgathering activities without first providing notice to the Director of the Office of Public Affairs and obtaining the express authorization of the Attorney General.

Id. § 50.10(f)(2).

Relying on this regulation, Neely argues that as the host of the Global Enlightenment Radio Network, he is a member of the news media.  Mot. to Dismiss Case at 2–3.  Thus, he argues, his arrest in connection with those activities, which he alleges was executed without first consulting the Attorney General, violates the Department of Justice's policy.  Id. at 3.

The government represents that it did, in fact, follow the procedures set forth in 28 C.F.R. § 50.10(f)(2).  See Resp. to Mot. to Dismiss Case [ECF No. 36] at 1–2 ("The Government represents that it has complied with the Policy in this matter.").  The government also argues that the Policy, by its terms, "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States."  Id. at 2 (quoting 28 C.F.R. § 50.10(j)).  Despite the Court's desire for more transparency from the government about the circumstances of its asserted compliance with the Policy, the Court agrees that even if the government did not follow the Policy, the Policy does not provide a basis for dismissal of the case.  See In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1153 (D.C. Cir. 2006) (noting that the guidelines in 18 C.F.R. § 15.10 "exist to guide the Department's exercise of its discretion in determining whether and when to seek the issuance of subpoenas to reporters, not to confer substantive or procedural benefits upon individual media personnel"); United States v. Costianes, Crim. No. JKB-21-0458, 2022 WL 1664468, at *1 (D. Md. May 25,

2022) (declining to dismiss January 6 case based on alleged noncompliance with 28 C.F.R. § 50.10(f)(2)).

Hence, the Court will not dismiss any of the charges against Neely based on the asserted failure of the government to follow the Department of Justice's policy regarding the media.

## Motion to Transfer Venue

In his amended motion to transfer venue, Neely requests that the Court transfer the case to a different venue, offering the Eastern District of Virginia as an alternative, because he argues that the jury pool in Washington, D.C. is biased.  See Am. Venue Mot. at 22–23.  This Court and numerous others have denied such motions and explained their reasoning at great length.  See, e.g., United States v. Brock, Crim. A. No. 21-140 (JDB), 2022 WL 3910549, at *4–8 (D.D.C. Aug. 31, 2022); United States v. Nassif, 2022 WL 4130841, at *8–10 (D.D.C. Sept. 12, 2022).  The Court incorporates in full its discussion in Brock and Nassif and briefly addresses the additional arguments raised by Neely that are not addressed in any earlier opinions from this Court.

In deciding a venue transfer motion based on the risk of a biased jury pool, courts consider the four factors articulated in Skilling v. United States, 561 U.S. 358, 382–84 (2010): (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage; and (4) if the case has already been tried, whether the defendant was acquitted on any counts.  The discussion in Brock and Nassif focused on the first three factors.  See Brock, 2022 WL 3910549, at *4–8; Nassif, 2022 WL 4130841, at *8–10.  The Court denied the requests for a change of venue in those cases, finding that (1) Washington, D.C. is too large and diverse a population to presume prejudice on the part of all potential jurors; (2) the coverage of January 6, even in D.C., was not of the "blatantly prejudicial" type that viewers cannot be expected to ignore; and (3) the passage of almost two years between January 6, 2021 and defendants' late 2022 trials mitigated

11

any potential prejudice.  See Brock, 2022 WL 3910549, at *4–8; Nassif, 2022 WL 4130841, at *8–10.

These findings apply equally to Neely's case, as he has not identified any information specific to his case that would change the Court's conclusion.  Neely attached three surveys, which he argues show that D.C. jurors are more exposed to media coverage and more likely to have prejudged January 6 defendants.  See Am. Venue Mot. at 6–10, 18–22; Ex. 1 to Venue Mot. [ECF No. 28-1] ("In Lux Survey"); Ex. 2 to Venue Mot. [ECF No. 28-2] ("Select Litigation Survey"); Ex. 3 to Venue Mot. [ECF No. 28-3] ("Zogby Survey").  One of these—the Select Litigation Survey—was considered in Brock and Nassif.  See Brock, 2022 WL 3910549, at *7; Nassif, 2022 WL 4130841, at *9–10.  In considering the Select Litigation Survey, the Court noted that "public opinion polling commissioned by one party is often less probative than a 'recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel,'" Brock, 2022 WL 3910549, at *7 (quoting United States v. Haldeman, 559 F.2d 31, 64 n.43 (D.C. Cir. 1976) (en banc) (per curiam)), and that the survey's results were "mixed," as they "suggest that an overwhelming majority. . . of D.C. respondents believe that January 6th defendants will receive a fair trial in D.C.," id.

The In Lux Survey and the Zogby Survey compel similar findings.  Both surveys were commissioned by January 6 defendants, see In Lux Survey at 1; Zogby Survey at 2, and both surveys suffer from the types of design defects that gave the D.C. Circuit pause in Haldeman.  See United States v. Garcia, Crim. A. No. 21-0129 (ABJ), 2022 WL 2904352, at *12 (D.D.C. July 22, 2022) ("Zogby's loaded questions illustrate exactly why the D.C. Circuit is of the view that carefully crafted, non-leading questions approved by a neutral judge are more likely to uncover bias than questions formulated by a consultant paid by one party."); id. at *13 ("[T]he In Lux Survey suffers from similar defects . . . .").  And importantly, neither survey suggests that potential

jurors in D.C. would be unable to be impartial if seated on a January 6 jury such as Neely's. For example, 70% of D.C. respondents in the In Lux Survey reported that they could be "fair and impartial jurors." In Lux Survey at 13; see also United States v. Rhodes, No. 22-cr-15 (APM), 2022 WL 2315554, at *21 (D.D.C. June 28, 2022) (finding that high percentage of D.C. respondents who reported they could be "fair and impartial" jurors "strongly rebuts any notion of presumed prejudice"). These additional surveys thus do not change the Court's conclusion that the "size and characteristics" of D.C. do not merit a change in venue.

Neely further claims in his motion that "[e]very other case that's gone to jury trial has resulted in a guilty verdict." Am. Venue Mot. at 18. While technically true—every January 6 jury trial has resulted in a guilty finding on at least one count—an examination of recent cases affirms that "D.C. jurors can make individualized decisions about January 6 defendants' guilt or innocence on each count, based on the evidence presented," Sheppard, 2022 WL 17978837, at *7. "[I]n the highest-profile January 6 case to go to trial, United States v. Rhodes, a Washington, D.C. jury acquitted every defendant of some counts." Id. (citing Min. Entry, United States v. Rhodes, No. 22-15 (APM) (D.D.C. Nov. 29, 2022)). The Court is thus not persuaded by Neely's misleading argument about the outcomes of January 6 trials.

Finally, in his amended motion Neely describes media coverage of him and an alleged "hack[ing]" of his Twitter account, arguing that such occurrences support his motion to transfer. See Am. Venue Mot. at 23–26. Some of the media coverage Neely raises, such as a Rolling Stone article or the activity on his Twitter account, has a national audience and accordingly would have no bearing on a motion to transfer venue. Even the coverage based in D.C., such as a Washington Post article from over a year ago, has a somewhat national scope—and at a minimum, it likely has wide readership in the Eastern District of Virginia, Neely's preferred district. But more fundamentally, the publication of a few articles describing Neely's actions on January 6 does not

create the kind of prejudice <u>Skilling</u> warns about.  "[P]rominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance."  <u>Rhodes</u>, 2022 WL 2315554, at *22 (quoting <u>Skilling</u>, 561 U.S. at 381).  And if any jurors have read those articles, they can be identified and questioned further during voir dire.

In sum, the Court reaffirms its conclusion that the January 6 cases, including Neely's, are not the extreme cases where a presumption of prejudice exists warranting pretrial change of venue and will accordingly deny Neely's motion to transfer.

**<u>Motion to Retain Notes</u>**

Neely asks the Court to order "all government law enforcement officers who investigated the charges in this and related cases to retain and preserve all rough notes, memoranda, emails and writing of any form taken as part of their investigation of the above-captioned matter notwithstanding whether or not the contents of said notes are incorporated in official record."  Mot. to Retain Rough Notes at 1 (footnote omitted).  The government represents that its practice is to retain notes from witness interviews and that it has produced these notes in discovery.  Gov't's Resp. to Mot. to Retain Rough Notes [ECF No. 38] at 1.  Given that representation, and the fact that Neely has not filed a reply challenging it, the motion appears to be moot, and the Court will deny it.

**<u>Motion to Compel Access to Nonpublic Areas of the Capitol</u>**

Neely also filed a motion to compel access to nonpublic parts of the Capitol.  As Neely acknowledges, his defense team has already been afforded access to many nonpublic parts of the Capitol.  <u>See</u> Gov't's Resp. to Mot. to Compel Access [ECF No. 39] at 5–6 (describing the "crime scene walkthroughs" arranged by U.S. Capitol Police for defense counsel that went through "public and non-public areas within the Capitol"); Mot. to Compel Access at 2 (acknowledging that Neely's defense team attended two of those tours and planned to attend a third tour in late

14

August).  Neely's motion appears to challenge the restrictions set on those tours: attendees were not permitted to "deviate from the tour or take pictures in places designated as non-public."  Id.

Under Federal Rule of Criminal Procedure 16(a)(1)(E)(i), "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control" and, relevant here, "the item is material to preparing the defense."  "Although the materiality standard is not a heavy burden, the Government need disclose Rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (cleaned up).  "Materiality is, to some degree, a sliding scale; when the requested [discovery is] only tangentially relevant, the court may consider other factors, such as the burden on the government that production would entail or the national security interests at stake, in deciding the issue of materiality."  United States v. George, 786 F. Supp. 56, 58 (D.D.C. 1992).  Even if an item is material, district courts retain discretion to order narrow discovery: "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."  Fed. R. Crim. P. 16(d)(1).

Neely identifies two pieces of evidence he can only obtain from a less restrictive tour of the Capitol, which he argues are needed for preparation of his defense.  First, he describes a "decontamination staging area" that was "purportedly set up in the Crypt of the Capitol and/or the Capitol Visitor Center" during the attack on January 6.  Mot. to Compel Access at 2.  Neely has not been able to determine the location of this decontamination area from discovery so far; however, he notes that discovery in other cases has shown "a decontamination area in an underground corridor at or near the West side of the Capitol."  Id. at 2–3.  Neely claims this area has "not been made accessible on previous tours for defense counsel."  Id. at 3.  According to

Neely, he is accused of entering this decontamination area and taking items from it, including an officer's jacket.  Id. at 2.  He argues that access to the corridor will allow him to "prepare for possible impeachment" by (1) uncovering whether the officer "left his items in a decontamination area accessible to Mr. Neely" and, if the officer did not leave the jacket in the area, (2) providing evidence conflicting the officer's statement[3] that he left the jacket in the Crypt or Capitol Visitor Center, which would suggest that his memory of the day is inaccurate.  Id. at 3–4.

The Court agrees that both of those pieces of information are potentially material to Neely's defense.  However, allowing defense counsel access to the corridor would not provide Neely with either piece of information.   Even if, during defense counsel's proposed tour, the group encountered closed or locked doors that may suggest the corridor is not accessible to the public, there is no reason to believe that those doors were closed or locked during the chaos of January 6.  The rioters accessed numerous spots within the Capitol that were supposed to be inaccessible, and there is no reason to believe this hallway would be any different.  As to impeaching the officer's testimony, visiting the potential decontamination area would not give Neely any information as to whether the officer in fact left his jacket in the decontamination area.  As the government notes, "the videos and photographs taken on January 6 are material," while "anything that counsel would view . . . on tour now" would not be.  Resp. to Mot. to Compel Access at 9–10.

Second, Neely argues that his "path traveled" through the Capitol is relevant to the defense and should therefore "be photographed and videotaped for his trial preparation."  Mot. to Compel Access at 4.  Some of the places he allegedly traveled through, such as the Senate Wing Door, are nonpublic, so photographing them was prohibited on previous tours.  See id.; Ex. 2 to Mot. to

_____

[3] Neely provided a copy of an officer's statement as an exhibit to his motion.  See Ex. 4 to Mot. to Compel Access [ECF No. 29-4].  The officer states that he removed his jacket and baseball cap during decontamination in the "Crypt and CVC ['Capitol Visitor Center']."  Id. at 1.  Neely suggests that this statement references the jacket the government alleges Neely stole, see Mot. to Compel Access at 2, which is not disputed by the government, so the Court assumes for purposes of this motion that this statement describes the jacket in question.

Compel Access [ECF No. 29-2] (describing locations on the tour and indicating that the Senate Wing Door is "non-public"). Neely argues the path he took is relevant because it would show "the amount of time he would have taken to reach [the Memorial Doors] from the Crypt or CVC area, the exit's proximity to the alleged decontamination area, and if there was any opportunity on that journey to discard items in his possession." Mot. to Compel Access at 4–5.

But Neely has not shown why photographs and measurements of the path he took out of the Capitol would be material to his defense given that his defense team has already been afforded access to these areas and in light of the extensive discovery the government has provided. See Resp. to Mot. to Compel Access at 10 (describing the "volumes of video and photographic evidence regarding the locations of doors, hallways, or other objects in the Capitol"). The distance between the exit and any decontamination areas (and therefore the time it takes to travel between them) can be generally discerned from simply walking the pathway, which defense counsel has already been able to do. Neely has not shown how precise measurements would "significantly . . . alter the quantum of proof in his favor," Graham, 83 F.3d at 1474. Similarly, it is not clear how photographs would illuminate the availability of trash cans or other receptacles in which Neely could discard items along the way. Even assuming the hallways are set up the same way they were on January 6—which is doubtful—testimony by an investigator who attended one of the Capitol tours can provide that information sufficiently without photographs.

Thus, the Court will deny Neely's requests as Neely has not shown why the relief he seeks would provide information material to his defense as required under Rule 16. And even if the materials sought were tangentially relevant, a consideration of "other factors, such as the burden on the government that production would entail or the national security interests at stake," George, 786 F. Supp. at 58, confirms that Neely is not entitled to further access to and documentation of the Capitol.

17

Although the Court concludes that the requested access to the Capitol would not unearth material information, even if some information was arguably material the Court would still exercise its discretion to deny Neely's requests.  Under Rule 16(d)(1), "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."  In considering discovery requests under Rule 16, courts weigh, among other things, how relevant the information is, "the burden on the government that production would entail," and "the national security interests at stake."  George, 786 F. Supp. at 58.

Both the burden on the government and the national security interests at stake here caution against allowing further access to the Capitol.  Concerning the burden on the government, organizing tours for defense counsel, particularly to access the nonpublic areas that Neely has requested, requires "permissions from numerous officials in the Legislative Branch."  Resp. to Mot. to Compel Access at 8.  The government submitted an affidavit from Sean Gallagher, the Capitol Police officer in charge of protection of the Capitol.  See Ex. 1 to Resp. to Mot. to Compel Access [ECF No. 39-1] ("Gallagher Decl.") at 1.  As Gallagher described, providing any one defendant with a bespoke tour of the Capitol would require Capitol Police resources; if courts were to grant such requests from other January 6 defendants (of which there are hundreds), "the sheer volume and resource expenditure would be a virtually impossible task that would significantly tie up valuable [Capitol Police] resources."  Id. at 3.  The Capitol Police has already extended itself and allowed multiple tours of the Capitol for defense counsel.

Granting Neely's request may also impact national security.  First, any resources tied up with additional tours of the Capitol would necessarily detract from the Capitol Police's primary responsibility, securing the Capitol.  Gallagher identifies a second, more troubling way: allowing photographs and measurements of the nonpublic areas of the Capitol could "provide a wealth of information to an adversary who might wish to calculate blast distance, the ability to fly a drone

18

within the building or how large of a group could quickly pass through the hallways."  Gallagher Decl. at 3 (footnotes omitted); see Order at 6, United States v. Egtvedt, No. 21-177 (CRC) (D.D.C. Sep. 12, 2022), ECF No. 89 (finding that these security concerns were "credible" and offered "good cause" to deny a similar request).

Discovery in this and other January 6 cases has been voluminous.  The government, coordinating across a wide swath of agencies and branches, has sought to balance national security, limited resources, and defendants' need for information.  Granting Neely's requests—which would likely lead to similar requests from other January 6 defendants'—would unduly tip the scales in one direction.  Without a stronger showing of materiality, the Court will not require the prosecution and Capitol Police to expend further resources and potentially compromise national security.

## **Motion to Suppress**

Neely asks the Court to suppress the statements given during his post-arrest interview on October 18, 2021,[4] arguing that the interview was conducted in violation of Miranda v. Arizona, 384 U.S. 436 (1966).  Mot. to Suppress at 5.  He argues (1) the October "confession was obtained by improper inducement" because "[t]he agent started questioning Mr. Neely before any warning was given," (2) he "believed that he was actually helping law enforcement and was given the impression that he would not be charged," and (3) his "limited education and understanding of the criminal justice system shows that he clearly did not understand the consequences of talking to the FBI."  Id.

The Fifth Amendment privilege against self-incrimination provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In Miranda, the Supreme Court held that the privilege applies in custodial settings, because "the

---

[4] Neely was also interviewed on March 2, 2021 and in July 2021.  See Mot. to Suppress at 2.  He does not challenge the admission of any statements given at those interviews.

compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations," 384 U.S. at 461, and thus there is a heightened risk that individuals will not be "accorded [their] privilege under the Fifth Amendment," id. at 439.  "To protect against that risk, Miranda set forth 'concrete constitutional guidelines for law enforcement agencies and courts to follow.'"  United States v. Straker, 800 F.3d 570, 614 (D.C. Cir. 2015) (quoting Miranda, 384 U.S. at 442).  Miranda thus "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained," whereas "giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility."  Missouri v. Seibert, 542 U.S. 600, 608–09 (2004).  "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver."  North Carolina v. Butler, 441 U.S. 369, 373 (1979).

Following Neely's arrest on October 18, 2021, he was processed and signed a Miranda form indicating that he understood and waived his rights.  See Resp. to Mot. to Suppress [ECF No. 43] at 8–9.  He was then questioned for approximately 35 minutes.  See id. at 9.  Neely alleges, however, that "officers and agents engaged Mr. Neely in conversation about the [January 6] activities before he was [M]irandized."[5]  Mot. to Suppress at 2.

In Missouri v. Seibert, the Supreme Court held that in some instances, "a statement repeated after a [Miranda] warning"—one that had been first made pre-Miranda warning—"is inadmissible."  542 U.S. at 604.  Thus, if a defendant claims he has been "questioned first, then warned later," "courts must determine 'whether it would be reasonable to find that in [those

---

[5] Neely's motion to suppress is light on details.  This is in part due to Neely's disappearance in Fall 2022, as his counsel was unable to meet with him to supplement the motion.  See Notice of Filing.  In consideration of that, the Court gave Neely additional time following his arrest to supplement this motion with any further details that would support his barebones claims.  See Oct. 24, 2022 Min Entry.  Neely did not file any supplementation or a reply.

circumstances the warnings could function "effectively" as <u>Miranda</u> requires.'"  <u>Straker</u>, 800 F.3d

at 617 (quoting <u>Seibert</u>, 542 at 611–12).  The <u>Seibert</u> plurality identified

> a series of relevant facts that bear on whether <u>Miranda</u> warnings delivered
> midstream could be effective enough to accomplish their object: the completeness
> and detail of the questions and answers in the first round of interrogation, the
> overlapping content of the two statements, the timing and setting of the first and
> the second, the continuity of police personnel, and the degree to which the
> interrogator's questions treated the second round as continuous with the first.

542 U.S. at 615.  Justice Kennedy provided the fifth vote but wrote a concurrence articulating a

different test, which would be "applicable only in the infrequent case."  <u>Id.</u> at 622 (Kennedy, J.,

concurring in the judgment).  He would find a Fifth Amendment violation only where "the two-

step interrogation technique was used in a calculated way to undermine the <u>Miranda</u> warning."  <u>Id.</u>

Courts differ on which test articulated in <u>Seibert</u> is controlling, and the D.C. Circuit has not

resolved the issue.  <u>See</u> <u>Straker</u>, 800 F.3d. at 617.

       The Court need not resolve this issue now, as the facts alleged by Neely do not make out a

colorable claim under either the <u>Seibert</u> plurality or Justice Kennedy's concurrence.  Under Justice

Kennedy's concurrence, Neely would need to show that the officers and agents who questioned

Neely "deliberately use[d] a two-step interrogation to thwart <u>Miranda</u>."  <u>Straker</u>, 800 F.3d at 618.

Neely does not allege any bad intent or offer any reason to believe the officers' strategy was

designed to undermine <u>Miranda</u>.

       Neely's suppression motion fares no better under the factors articulated by the plurality

opinion in <u>Seibert</u>.  All he alleges is that "[t]he defense believes that officers and agents engaged

Mr. Neely in conversation about the [January 6] activities before" he was read the <u>Miranda</u>

warnings.  Mot. to Suppress at 2; <u>see also id.</u> at 5 ("The agent started questioning Mr. Neely before

any warning was given.").  The <u>Seibert</u> plurality focuses on the "completeness and detail of the

questions and answers in the first round of interrogation" and "the overlapping content of the two

statements."  542 U.S. at 615.  Even if the agents asked Neely general questions about January 6

prior to his Miranda warnings, Neely does not allege that they were done to elicit a confession or any other incriminating evidence. See United States v. Hitselberger, 991 F. Supp. 2d 130, 141 (D.D.C. 2014) (noting that "agents only asked general questions, with the purpose of establishing rapport . . . not to elicit a confession," and thus the case was "not even close to the calculated two-step inquiry in Siebert [sic]").

Nor does Neely allege that he did, in fact, confess or offer any other incriminating statement, let alone one that was later "repeated" in the statements he seeks to have suppressed. The harm identified by Seibert was the likelihood that a defendant, having confessed and then been read his Miranda warnings, would make the "entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail." 542 U.S. at 613; see also United States v. Rodriguez-Preciado, 399 F.3d 1118, 1129–30 (9th Cir.) (noting that Seibert applies when "police begin a custodial interrogation without advising the suspect of his Miranda rights, obtain incriminating statements, and then continue questioning after administering warnings in order to re-elicit the incriminating statements" (emphases added)), amended in irrelevant part, 416 F.3d 939 (9th Cir. 2005). That is not the case here: Neely does not claim he confessed to any crime pre-warnings, and thus there is little reason to believe that his subsequent waiver was anything other than knowing and voluntary.

A review of the custodial interrogation post-warning further confirms how far this case is from Seibert. Agents did not reference any previous statements made by Neely, contra Seibert, 542 U.S. at 616 ("The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given."), and Neely and the agents' conduct at the beginning of the interview gave no indication that it was a continuation of a prior interrogation. Even if some of the questions overlapped with questions asked pre-warnings—something Neely does not allege—"[m]erely asking the defendant about the

22

same subjects pre- and post-<u>Miranda</u> is not forbidden." <u>United States v. Fernandez</u>, 48 F.4th 405, 411 (5th Cir. 2022) (internal quotation marks omitted).  In sum, the "facts of this case are wholly distinguishable from <u>Seibert</u> and other cases in which <u>Miranda</u> warning[s] [were] administered 'midstream,' and post-confession." <u>United States v. Apodaca</u>, 275 F. Supp. 3d 123, 149 (D.D.C. 2017).

Neely also argues briefly that his <u>Miranda</u> waiver was not made knowingly and voluntarily, and that his post-warning statements were not given voluntarily.  <u>See</u> Mot. to Suppress at 5.  But those contentions are not supported by his motion or the record before the Court.

A defendant's waiver of his <u>Miranda</u> rights must be both knowing and voluntary.  <u>See</u> <u>Edwards v. Arizona</u>, 451 U.S. 477, 482–83 (1981).  The "knowing" requirement asks whether the defendant waived his rights "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  A waiver is "voluntary" if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception."  <u>Id.</u>  Further, statements made after a valid <u>Miranda</u> waiver may nonetheless be suppressed if the statements themselves were not made voluntarily.  Courts ask whether the "interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." <u>Miller v. Fenton</u>, 474 U.S. 104, 109 (1985)

First, nothing in Neely's motion or the record suggests that his <u>Miranda</u> waiver was not given knowingly and voluntarily.  The post-warnings interview began with agents showing Neely the signed "Advice of Rights" form and noting that "at 08:50, you signed the Advice of Rights." <u>See</u> Federal Bureau of Investigation Advice of Rights Form [ECF No. 43-1].  Neely responds, "Yes I did, we did this already before."  And considering the "totality of the circumstances,"

nothing in the interview suggests that Neely's waiver—or any subsequent statement—was involuntary, and Neely "points to no facts undermining the reliability of the waiver." <u>Straker</u>, 800 F.3d at 625.  Neely asserts that he believed he was working for the FBI and that he would not be charged.  But the record belies that belief: before any questioning, agents showed Neely the criminal complaint with a list of charges he is facing.  <u>See</u> Resp. to Mot. to Suppress at 5–6.  Neely read through the charges and indicated that he understood them.

Nonetheless, Neely argues that his "limited education and understanding of the criminal justice system shows that he clearly did not understand the consequences of talking to the FBI." Mot. to Suppress at 5.  But "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987).  The only thing Neely must have known is that "he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." <u>Id.</u>  And the <u>Miranda</u> waiver he signed informed him of exactly that.

Further, there is no evidence to suggest that any statements made following Neely's <u>Miranda</u> waiver were made involuntarily.  The tone of conversation was collegial, and Neely did not seem averse to talking with the agents.  For example, at one point when discussing an item Neely may have taken from the Capitol, Neely told the agents, "If you'd have just let me know all this in advance, I'd have brought it to you . . . . I'd have been like, hey, here."

In sum, agents acted properly in reading Neely his <u>Miranda</u> rights and having him review and sign the waiver form if he consented.  <u>See</u> <u>United States v. Yunis</u>, 859 F.2d 953, 961 (D.C. Cir. 1988) ("The administration of proper <u>Miranda</u> warnings, followed by a written waiver of the rights described in those warnings, will usually go far toward demonstrating that a decision to speak is not compelled.").  There is no indication that agents used "intimidation, coercion or deception" to overcome his free will or otherwise render his waiver or statements involuntary.

<u>Moran</u>, 475 U.S. at 421.  Thus, the Court will deny Neely's motion to suppress his statements[6] and will deny his request for a suppression hearing.[7]

## **Motions in Limine**

Both parties filed several motions in limine in the weeks preceding Neely's previously scheduled October 2022 trial.  Given the change in circumstances over the last three months, the parties are instructed to confer and inform the Court if any of the issues raised by the motions in limine are no longer relevant and which motions still require judicial action.

## **Conclusion**

For the foregoing reasons, each of Neely's pretrial motions is denied.  A separate Order consistent with this decision accompanies this Memorandum Opinion.

/s/
JOHN D. BATES
United States District Judge

Dated: <u>February 6, 2023</u>

---

[6] Neely also requests suppression of "physical evidence found on social media."  Mot. to Suppress at 5.  He gives no basis for that suppression and his request will accordingly be denied without prejudice.

[7] Neely requested a hearing on his suppression claim.  Mot. to Suppress at 1.  Courts vary on the precise test used to determine whether a hearing is necessary, but under no test would a hearing be required here.  For example, in the Seventh Circuit, a "court must conduct such a hearing only if evidence on an issue of fact is necessary to the decision of the motion" and "to justify a hearing, the facts presented in the motion must be definite, specific, detailed and nonconjectural." <u>United States v. Rollins</u>, 862 F.2d 1282, 1291 (7th Cir. 1988) (internal quotation marks omitted). Even after being granted months to offer more specific allegations, Neely has not put forth any detailed or nonconjectural factual allegations that would establish a factual dispute to be resolved at a hearing—his motion is entirely conclusory.  Thus, under any test articulated by courts, he has not carried his burden to warrant a hearing. <u>See, e.g.</u>, <u>United States v. Voigt</u>, 89 F.3d 1050, 1067 (3d Cir. 1996) (noting that the Third Circuit "held that a defendant's moving papers must demonstrate a 'colorable claim' for relief" and the defendant must "allege[] facts that, if true, could violate a defendant's rights" (internal quotation marks omitted)); <u>United States v. Harrelson</u>, 705 F.2d 733, 737 (5th Cir. 1983) ("Factual allegations set forth in the defendant's motion, including any accompanying affidavits, must be sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." (internal quotation marks omitted)); <u>United States v. Phillipos</u>, 849 F.3d 464, 468 (1st Cir. 2017) ("A defendant is entitled to an evidentiary hearing as to the voluntariness of his confession only if the defendant makes a sufficient threshold showing that material facts are in doubt or dispute, and that such facts cannot reliably be resolved on a paper record." (internal quotation marks omitted).  The Court has reviewed the video of the interview, which provides more than sufficient factual basis to deny his claims.  A hearing would thus be of no use in resolving the issues.