UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA   : | |
| : | |
| v.   : | |
| : | CASE NO. 1:21-cr-642-JDB |
| DARRELL NEELY,   : | |
| : | |
| Defendant.   : | |

GOVERNMENT'S OMNIBUS MOTION *IN LIMINE*
AND NOTICE OF TRIAL ISSUES

In order to streamline the issues for the upcoming pre-trial conference on May 17, 2023, the Government respectfully files this omnibus motion *in limine* to preclude certain evidence that it anticipates the defense will seek to introduce at trial, as well as provide to notice the Court of recent developments related to this case.

**I.   Government's Motion *in Limine* to Preclude Defendant's Fishing Expedition into the Credentialing Process for Members of the Media**

As the Court is aware, one of the defendant's anticipated defenses at trial—which the Government disputes—is that he was at the Capitol on January 6 "as a member of the press" filming the rally on behalf of his radio network, the Global Enlightenment Radio Network. *See* ECF No. 31 at 2. As trial approaches, it is increasingly clear that defense counsel intends to introduce evidence and elicit testimony that has nothing to do with his case—in particular, which media members were credentialed on January 6, 2021 and the processes used to issue those credentials. The Court should decline to sanction this fishing expedition.

Earlier in this case, defense counsel requested from the Government a list of all members of the news media who were present at the Capitol on January 6, 2021 but who were not charged due to their status as a member of the news media, which the Government declined to provide. *See*

1

ECF No. 47 at 2. The Government moved *in limine* to preclude evidence regarding cases against other members of the media, to which defense counsel represented in reply that "Mr. Neely intends to present evidence of *his* employment" and had "no intention of arguing any facts regarding others 'which would implicate procedural events occurring after January 6.'" ECF No. 71 at 1 (emphasis added). In its ruling, the Court stated that "evidence related to charging decisions concerning members of the media is not relevant to Neely's guilt or innocence" and also relied on the defendant's representation in granting the Government's motion. ECF No. 80 at 6 (dated April 18, 2023).

A day after the Court's ruling, defense counsel issued a subpoena (dated April 19, 2023) compelling the testimony of the Director of the Senate Radio and Television Gallery (the "Gallery"), Mr. Michael Mastrian. The Government had earlier provided in discovery a certification by Mr. Mastrian, attached hereto as Exhibit A, describing generally that (1) the Gallery regulates access to the U.S. Capitol by credentialing qualifying members of the media; (2) the criteria for those qualifications; and (3) that the Gallery has no record of ever receiving an application for or issuing a credential to the defendant or the Global Enlightenment Radio Network. *See* Exhibit A.

In an effort to narrow the issues at trial, on May 3, 2023, the Government noticed its intent to introduce the certification and asked whether the defense still sought Mr. Mastrian's live testimony. On May 7, 2023, defense counsel reiterated their intent to call Mr. Mastrian. When government counsel inquired what testimony defense counsel sought to elicit from Mr. Mastrian, the defense's response was, in part, "Why mr. neely not on his list, among other things as we get closer"—a question clearly addressed by the certification itself. Nonetheless, in order to potentially make Mr. Mastrian available to the defense, the Government included Mr. Mastrian on its witness

2

list filed with the Court. *See* ECF No. 88; *see* Fed. R. Evid. 803(10), Cmte. Notes on Rules—2013 Amend. (noting this provision incorporates a "notice-and-demand" procedure approved by *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009)).

On May 10, 2023, defense counsel requested from the Government by email "the list for all press id badges that were issued for January 5 and 6, 2021."[1] The following day, on May 11, 2023, government counsel was made aware that the defense team contacted the U.S. Senate Sergeant at Arms wanting to know who oversees issuing press passes in order to serve additional subpoenas.

In sum, the defense team's recent requests and conduct suggests that they will seek to introduce evidence and argument about credentialed members of the media on January 6, 2021, and the credentialing process generally. Such evidence is clearly irrelevant to the defendant's case and should be precluded. For the same reason, the Court should limit Mr. Mastrian's testimony to the defendant's and his network's lack of application or credential. Even assuming, hypothetically, that the Senate – for whatever reason – did or did not credential other media persons on January 6, none of that would address the defendant's lack of an application or his conduct in this case.

    a. <u>Evidence About Credentials Issued to Members of the Media, and the Credentialing Process Generally, is Irrelevant</u>

Evidence is admissible only if is relevant. Fed. R. Evid. 402. Relevant evidence "has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401.

---

[1] Counsel for the Government declined this request on May 15, 2023.

As background, there are seven congressional press galleries overseen by four correspondents' committees. *See* Congressional Research Service, *Congressional News Media and the House and Senate Press Galleries*, R44816 at "Summary" (April 13, 2017), available at https://crsreports.congress.gov/. The correspondence committees oversee which journalists receive congressional press credentials. *Id.* at 4. Among other things, press credentials entitle journalists to a particular gallery type in both the House and the Senate, along with access to the resources provided by the gallery's office. *Id.*

But this case is not about press credentials. At no point during this case has defendant proffered that he was an officially credentialed member of the congressional news media on January 6, 2021. The only evidence on this point, in Mr. Mastrian's certification, is that the Senate Radio and Television Gallery has no record of the defendant or his network even applying for a press credential.

Evidence and argument about the press credentials that were issued to members of the media on January 6, 2021, is irrelevant to the defendant's case. The fact that other individuals had credentials in no way sanctions or authorizes the defendant's own presence on Capitol grounds (let alone, for instance, his theft of Capitol police property). It also has no bearing on the defendant's *mens rea* because there is no basis to believe he would have been aware of those media members' credentials. *See* ECF No. 80 at 10 ("As a logical matter, however, any action or inaction of which defendant was not aware cannot possibly have had any effect on his state-of-mind and is inadmissible as irrelevant under Federal Rule of Evidence 401" (quoting Mem. & Order at 3–4, *United States v. Williams*, Crim. A. No. 21-377 (BAH) (D.D.C. June 8, 2022), ECF No. 87).

Similarly, evidence and argument about the procedures that each gallery uses to issue credentials to members of the media on January 6, 2021 is irrelevant. Whether the defendant had

4

a press credential from a congressional gallery is binary—either he had one, or he did not. The procedures the Gallery uses to decide to whom to issue credentials—which the defendant was presumably not aware of—provide context for how a gallery might reach a decision in a particular case, but they are not at issue in this case. That is because, as noted above, there is no evidence that the defendant even applied for a credential. And even if he had applied and were rejected, the defendant's subjective disagreement with the policies relied on to reach that decision would in no way sanction the defendant's presence on Capitol grounds or the other crimes he committed on January 6, 2021. Absent any factual proffer to the contrary, any argument or evidence about the procedures that each gallery uses to issue credentials to members of the media on January 6, 2021 is irrelevant and should be precluded.

      b. <u>Defense's Examination of Senate Gallery Director Michael Mastrian Should be Limited to the Fact that the Defendant Didn't Apply or Receive a Credential</u>

The Court should also apply these boundaries to limit the subject matter of Mr. Mastrian's testimony. The testimony that the Government intends to elicit from Mr. Mastrian is the main thrust of his certification—that the Senate Radio and Television Gallery has no record of the defendant or his network ever applying for or receiving a credential. That is the only aspect of Mr. Mastrian's testimony that is relevant to this case. To be sure, that aspect is relevant in two ways. The first and most obvious is that the defendant lacked "lawful authority" to enter or remain in a restricted area, part of the first element of the 18 U.S.C. § 1752(a)(1) offense. The second way is to rebut an anticipated defense—that regardless of whether he was credentialed, the defendant honestly believed he could be on Capitol grounds due to his employment and therefore lacked the requisite *mens rea* for some of the offenses (for example, whether the defendant entered or remained "knowingly" for the 18 U.S.C. § 1752(a)(1) offense or acted "willfully and knowingly" for purposes of the 40 U.S.C. §§ 5104(e)(2)(D) and (G) offenses). The fact that the Senate Radio

5

and Television Gallery has no record the defendant ever even applied for a credential (which he would have been aware of when he went to the Capitol) could lead a fact-finder to believe his belief was not honestly held. The other topics in Mr. Mastrian's certification—the Gallery's role in credentialing, and the criteria for those qualifications—are not relevant for the same reasons earlier described, *i.e.* there is no basis to believe the defendant even applied or would be aware of the criteria. Accordingly, Mr. Mastrian's testimony on this subject should be limited to his search for the defendant's and his network's application for a credential or lack thereof.

## II. Government's Notice Regarding the Woman in the Pink Beret and Motion in Limine to Preclude Related Exhibits

The Government previously moved to limit the defendant's questioning or argument that the woman with whom the defendant entered the Capitol was a government informant or member of law enforcement, that this woman somehow sanctioned the defendant's conduct, and to deny defendant's request for discovery on the same. *See* ECF No. 48, 78. The Court deferred ruling on the motion, instead requiring at the upcoming pretrial conference a proffer from the defendant of why this woman's testimony would be material (primarily relating to the theft charge against the defendant), and "[i]f, and only if that proffer is adequate," probing whether the "government is aware of both her identity and what she could testify about." ECF No. 80 at 8-9. The Court likewise deferred whether defense could cross-examine government witnesses about her alleged status, noting that "[a]bsent a specific basis to believe that this woman may have connections to law enforcement—and especially if the government represents that she does not—there would be no justification for that line of cross-examination of individual government witnesses. . . ." *Id.* at 9.

The Government wishes to alert the Court that, since its order, however, the Government has charged the woman with whom the defendant entered the Capitol, identified as Jennifer

Inzunza Vargas Geller, by publicly docketed complaint in this District. ECF No. 1-1, *United States v. Jennifer Inzunza Vargas Geller*, 23-mj-99-ZMF (D.D.C. May 9, 2023).

      a.   Notice Regarding Defense Counsel's Comments

As a threshold matter, the Government seeks to bring to the Court's attention that defense counsel, Kira West, has made certain comments to the media concerning the charging of Ms. Vargas Geller.

On May 7, 2023, a reporter affiliated with NBC News—who had authored an article released a day prior regarding Ms. Vargas Geller—posted on Twitter screenshots of he attributed to Ms. West. *See* Twitter user @RyanJReilly, Post dated May 7, 2023, available at https://twitter.com/ryanjreilly/status/1655285823611318272. Those screenshots—the accuracy of which the Government has not independently verified—state as follows:

> 1. The government is hiding the truth.  2. Mr Neely was used.  We don't know why.  And we want and deserve an answer.
> 3. From the very beginning of this case, Mr. Neely asked the government to find PBG.  We told the gov't  she would have the information to prove his innocence.  4. They waited two years to even put out an FBI wanted call for her.
> 5.  We could have had this info two years ago if the FBI wanted to do their job.  But now we are two weeks from trial and they are just doing this?  Question that.  It's a search for the truth for Mr. Neely. Shouldn't we expect that from the FBI?
> 6.  Our question is, why they weren't looking sooner when we brought it to their attention long ago?  Especially with Mr. Neely's liberty on the line.

> 7. Mr. Neely was a journalist that day. Why charge a journalist who was there only to report on the events. Luke Mogelson of the New Yorker went on the Senate floor, filmed the area and rifled through documents and took pictures of them. He hasn't been charged. Is The New Yorker more important than Mr. Neely's podcast? Or is it that Mr. Neely's views don't fit the narrative?
>
> Is this enough for you?
> Happy Kentucky Derby.
> Kira

Ms. West is also paraphrased in a publicly available article from Tuesday, May 9, 2023, stating that "they 'absolutely' still believe Vargas Geller might have ties to law enforcement and suggested prosecutors had [charged] her to prevent the defense from questioning her at trial." *See* Jordan Fischer, *'Pink Beret' identified, charged in Capitol riot case thanks to tweet from ex* (May 9, 2023), available at https://www.wusa9.com/article/news/national/capitol-riots/pink-beret-identified-charged-in-capitol-riot-case-thanks-to-tweet-from-ex-jennifer-inzunza-vargas-geller/65-f175eb3a-76df-4f09-8c29-e12bbd7d0895.

At this juncture, the Government seeks to put the Court on notice of these comments, but reserves the right to seek additional relief. *See* Local Criminal Rule 57.7(b)(1) ("It is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which the lawyer or the law firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice."), 57.7(b)(3)(iv), (vi) (prohibiting public comment on credibility of testimony or credibility of prospective witnesses or any opinion on the

evidence in the case).[2] And should Ms. West raise topics at trial that are squarely precluded by the Court's previous ruling on the motion *in limine*, such as charging decisions against other members of the media, the Government will seek appropriate remedy.[3] As a preliminary matter, however, the Government must rebut the inappropriate and unsupported assertion that Ms. Vargas Geller was charged to interfere with the defendant's due process. On the contrary, Ms. Vargas Geller was charged because she committed a crime. Ms. West's public declarations, without more, are troubling.

      b. <u>The Government Moves *in Limine* Regarding its Charging of Ms. Vargas Geller and Exhibits that Exclusively Relate to Her</u>

Indeed, the defendant has <u>not a scintilla of evidence</u> to support her repeated assertions, untethered from fact, that Ms. Vargas Geller is a member of law enforcement. Pending any actual proffer at the pretrial conference, the Court should grant the government's original motion *in limine* on this point. ECF No. 48.

The Government further moves to preclude any argument by defense counsel regarding the decision to charge or not charge Ms. Vargas Geller. The government's charging decisions regarding another defendant are irrelevant to this defendant's guilt or innocence. *See* Final Jury Instructions at 36, *Sheppard*, 21-cr-203-JDB (D.D.C. 2023). The defendant has previously represented that he "has no intention of arguing any facts regarding others 'which would implicate

---

[2] The Government notes that, on May 12, 2023, the defense indicated their intent to seek a bench trial in this case.

[3] For example, the defendant's exhibit list noticed, but did not provide, an exhibit titled "New Yorker - A Reporter's Footage from Inside the Capitol Siege New Yorker Video." *See* ECF No. 83, DX 715.  If Ms. West is seeking to introduce videos for the proposition that the New Yorker journalist who shot the video has not been charged, as suggested in her purported email to Mr. Reilly, the Government will move to preclude it as barred by the Court's ruling.

procedural events occurring after January 6,'" including decisions to prosecute. ECF No. 71. Such logic inexorably applies here.

Moreover, in its exhibit list for trial, the defense nevertheless noticed a 'series' of more than 30 exhibits related the conduct of Ms. Vargas Geller on January 6, 2021, as well as her subsequent investigation and prosecution. ECF No. 83 (900 series). The defense also noticed exhibits that relate to areas around the Capitol from areas where exclusively Ms. Vargas Geller—and not the defendant—appear to have been on January 6, 2021. *See, e.g.*, ECF No. 83 (DX 406, one of several exhibits relating to the Peace Circle, and DX 529, relating to the Senate Fire Door). Absent an adequate factual proffer from defendant as to their relevance to his case, all exhibits relating solely to Ms. Vargas Geller should be precluded.

**III.  Motion in Limine to Preclude Certain Defense Exhibits Related to the Restricted Perimeter and "Permitted Demonstrations"**

Defendant has also noticed certain exhibits in a "100 series" that appear to relate to the restricted perimeter and other supposedly permitted demonstrations near the Capitol grounds on January 6, 2021. These exhibits can roughly be described as follows:

- **Exhibit 101** is a compilation of six demonstration permits for groups who were authorized, by U.S. Capitol Police, to protest or demonstrate on Capitol grounds on January 6, 2021. None of those groups, however, were authorized to protest within the Restricted Perimeter.

- **Exhibit 102** is a lengthy document detailing the timeline of events for January 6, 2021.

- **Exhibit 103** consists of multiple screenshots and documents related to a U.S. Capitol Police Civil Disturbance Unit (CDU), a unit dedicated to responding to unlawful protests and assemblies on Capitol grounds. The documents pertain to an operational plan in advance of January 6, 2021, to prepare officers for expected or unexpected events. It includes information about the permitted use of force, or the expected demonstrations occurring on Capitol grounds.

- **Exhibit 104** is an "After Action Report" produced by the U.S. Capitol Police.

To start, it is not clear why any of this evidence is relevant to the crimes charged against the defendant. While the government acknowledges that this evidence may become relevant at a later time, based on a conditional proffer or the development of facts at trial, at first blush, none of the above documents or information pertain to the defendant, or more importantly, knowledge possessed by the defendant.

Upon information and belief, however, we believe that all of these exhibits generally pertain to the defendant's irrelevant attempt to show that protests were lawfully permitted within the restricted perimeter on January 6, 2021. They were not. Candidly, this is not the first (nor apparently the last) time that this particular counsel intends to repeat this fruitless process.

   a. <u>Defense Exhibit 103 and subparts a-d[4]</u>

The CDU plan, Defense Exhibit 103, presents the crux of the issue. Defense counsel has made efforts over several cases, involving different defendants, to weave a narrative unsupported by the facts.[5] Looking to those past arguments as a guide to what defense will again likely argue

---

[4] Defense counsel has also requested by email a "map used by Services Bureau *(people who set up back racks) to prepare and set up the perimeter prior to [January 6] and the morning on [January 6]." It is unclear whether this is the same as Exhibit 103 or refers to something else; counsel for the Government has requested clarification. Nonetheless, this map would be irrelevant, because the *preparation* of the creation of the restricted perimeter is of no legal significance. Rather, as described below, the physical manifestation of the restricted perimeter—the bike racks, snow fences, postings—put individuals on notice that entering restricted perimeter was unlawful. *See generally Gov't Response to Def.'s May 2, 2023 Trial Brief*, ECF No. 97, *United States v. Leo Kelly*, 21-cr-708-RCL (D.D.C. May 2, 2023).

[5] For a more detailed discussion, *see Gov't Mot. In Limine to Exclude Irrelevant Evidence Rel. to Demonstrations*, ECF No. 92, *United States v. Leo Kelly*, 21-cr-708-RCL (D.D.C. Apr 27, 2023). In short, at trial in *United States v. Daniel Egtvedt*, 21-cr-177-CRC, this same defense counsel called U.S. Capitol Police Lieutenant Scott Grossi to testify about demonstrations, but he ultimately testified that no organizations were permitted to testify within the restricted perimeter,

11

here, the Government has attempted to simplify the issues for the Court to the following four issues: (1) Exhibit 103 does not actually show that a demonstration took place within the restricted perimeter; (2) regardless, the defendant's position misunderstands the legal concept of the restricted perimeter; (3) there is no evidence that this defendant knew about lawful protests occurring inside the restricted perimeter; and (4) Exhibit 103 is full of hearsay and does not satisfy any exception.

First, the defense will likely point to a single entry from the "Current Permitted Events" section of the exhibit to show that a permitted event in fact took place on "the steps of the United States Capitol, i.e. within the restricted perimeter. *See, e.g.*, ECF No. 96 at 3, *Kelly*, 21-cr-708-RCL (D.D.C. May 2, 2023). That entry states:

---

or specifically, on the Capitol steps. *See* ECF No. 111, Tr. at 473–74, *Egtvedt*, 21-cr-177-CRC (Dec. 6, 2022). In *United States v. Anthony Griffith*, 21-cr-244-CKK, instead of calling Lt. Grossi, the same defense counsel instead attempted to impeach a U.S. Capitol Police witness using Exhibit 103's reference to an alleged "permitted event" to "convene at the steps of the United States Capitol" called "Donald, You're Fired March on DC." *See* Def.'s Trial Brief, ECF No. 132 at 4, 7, *Griffith*, 21-cr-244-CKK (March 14, 2023). And in a trial less than two weeks ago, in *United States v. Leo Kelly*, this defense counsel sought to introduce some of the very same exhibits at issue here. Def.'s Trial Brief, ECF No. 96, *United States v. Leo Kelly*, 21-cr-708-RCL (D.D.C. May 2, 2023). In *Kelly*, Judge Lamberth sustained the government's objection on the defense evidence in its entirety, until the defendant supplied a requisite nexus, which he did in the form of testimony from the defendant's father that the family (including the defendant) intended to go to lawful protest on the outside perimeter of the restricted area.

12

> **Current Permitted Events for this operational period:**
>
> **Donald, You're Fired March on DC**
> Location: U.S. Capitol to White House
> Date: January 6, 2021
> Time: 1200 – 1500 hours
> Organizer: I Approve This Message
> Attendance: Unknown
> Description: On January 6th, 2021, at 12:00 p.m. Eastern Time, We, the People will convene at the steps of the United States Capitol to witness this momentous occasion. Upon the declaration the results of the 2020 elections, held on November 3rd, 2020, We the People will proceed, peacefully and safely, from the Capitol Building to the White House to deliver the message to Mr. Trump, "Donald, You're Fired!"

Not so. The contents of Exhibit 103 put the U.S. Capitol Police on notice of certain events that *may* be occurring – lawfully or unlawfully – on Capitol grounds. As was made clear from the Government's proffers in *Griffith*, no groups were given demonstration permits for First Amendment assemblies within the restricted perimeter, a fact corroborated, under oath in *Egtvedt* and *Kelly*, by the Lieutenant in charge of special permitting, Scott Grossi. And the government further proffered that the abovementioned "march" was neither permitted nor approved to occur within the restricted area. *See Griffith*, ECF No. 133, at 1 (explaining that the Capitol Police had determined that the source of the march was a website screengrab, not an actual application to protest, and that neither the U.S. Capitol Police, U.S. National Park Service, nor the Metropolitan Police Department had received a permit or authorized such a demonstration). To underscore the point: there is no evidence, at all, that this group or any other groups were lawfully permitted to protest *within* the restricted area. *See* ECF No. 97 at 4, *Leo Kelly*, 21-cr-708-RCL (D.D.C. May 2, 2023).

Second, defendant's exhibits show a fundamental misunderstanding the concept of the restricted perimeter. Under the defendant's theory, if people *were* lawfully allowed in the restricted perimeter to protest on January 6, 2021, then the restricted perimeter would collapse in on itself. Of course, this disregards that many individuals were lawfully authorized to be inside the restricted

13

perimeter that day, such as staff or law enforcement. Even if a lawfully authorized demonstration existed, it would not nullify the existence of the restricted permitter for purposes of 18 U.S.C. § 1752, since the statute only criminalizes the entry and presence within "any restricted building or grounds *without lawful authority* to do so." 18 U.S.C. § 1752(a)(1) (emphasis added).

Similarly, defendant may point to the preparation of the restricted perimeter or maps that differ from the government's, such as the map in Exhibit 103, copied below, to show that the restricted perimeter is somehow not enforceable:



Defense counsel may also point the fact that barriers were moved (by rioters) to show that the perimeter somehow ceased to exist. These arguments are illogical and wrong. Section 1752(c)(1) defines restricted grounds as "any posted, cordoned off, or otherwise restricted area (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1). Accordingly, the preparations for the restricted area are of no legal significance. Nor are updates to reports about the contours of the perimeter.

Rather, the restricted grounds are created by the postings, cordons, or other things that denote the restricted area. 18 U.S.C. § 1752(c)(1). In other words, the barriers, snow fences, and bike racks that physically manifest the restricted area put the public on notice that there the consequences for entering. The fact that some of those barriers may have been unlawfully moved may be relevant to a particular defendant's *knowledge* of the restricted area, but they do not somehow nullify it entirely. Moreover, the defendant himself – through discovery – is able to view all video and photographs in the government's possession to confirm the general accuracy of the perimeter and the whereabouts of the physical barriers.

Third, there is no proof that the defendant knew about lawful protests occurring inside the restricted perimeter or the maps contained in Exhibit 103. While the defendant's truthful knowledge of a protest within the restricted perimeter or an invitation to the same could factor into whether the defendant knowingly trespassed into a restricted area, no such evidence exists as to this nexus for this defendant. Similarly, this defendant never observed the map in Defendant's Exhibit 103 (or any map, to the government's knowledge), so any map would not be relevant to show what the defendant did or did not know about the perimeter.

Fourth and finally, Exhibit 103 is riddled with hearsay. Defendant has no plausible argument that a hearsay exclusion applies, especially in light of the Government's previous proffers as to the document's inaccuracies. The defense, however, is aware of one of the main authors of Exhibit 103, subpoenaing the witness in *Kelly*, but ultimately not calling him as a witness.

    b. <u>Defense Exhibits 101, 102, 104</u>

Briefly, the remaining exhibits suffer from the same flaws. Exhibit 101 – the authorized demonstration permits – have the same nexus and knowledge problems as described above. While

the government is prepared to stipulate as to their authenticity, the permits have nothing to do with what the defendant knew, saw, or experienced on January 6. Nor do the permits alter the legal landscape surrounding the definition or existence of a restricted perimeter.

Exhibit 102 – the timeline – and Exhibit 104 – the "After Action Report" – are similarly untethered to the defendant's knowledge of what occurred at the U.S. Capitol on January 6. Both also contain inadmissible hearsay. Exhibit 104 in particular appears to be a report issued by the U.S. Capitol documenting various failures throughout the day on January 6. It is conceivable that a portion of this report might be used for impeachment purposes for a government witness (such as for Ofc. Carll), but the remainder of the exhibit appears to be an attempt to evaluate the U.S. Capitol Police on their rights and wrongs of the day. This is not relevant to this case, and so the remainder of the report should be excluded.

The government respectfully moves *in limine* for these exhibits' exclusion. It is worth underscoring that the contours of whether the defendant unlawfully entered a restricted perimeter rests upon the facts of *this* case (rather than an examination of law enforcement's preparations). The latter will become an extensive trial within a trial about whether the Capitol Police properly constructed a perimeter. In this case, the defendant is alleged to have not only entered the perimeter unlawfully, but also to have participated in the use of a Trump billboard as a battering ram against MPD officers, entered the building, and stole Capitol police property. It is thus impossible to see how this evidence is relevant to the defendant's knowledge of the perimeter in this case.

## IV.   Notice Regarding Other Objectionable Exhibits

With respect to Series "001" and "200" – "800," the government is currently reviewing each proposed defense exhibit. While we do not anticipate objections to many exhibits, we respectfully reserve the right to object to inadmissible or irrelevant evidence, after careful review,

and depending on the manner and purpose of which the defendant seeks to introduce the material. However, defense has noticed two exhibits—Exhibit 301, labeled "Guy who steals stuff", and Exhibit 306 (Exhibit 305 on defendant's list, "Screenshot of Trash around capitol") that appear to have nothing to do with this defendant's conduct in the Capitol. The Government requests that Court seek a proffer of relevance from the defendant on these exhibits at the upcoming pretrial conference.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:      */s/ Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street, NW
Washington, D.C. 20001
(202) 252-7669
Michael.Barclay@usdoj.gov

KYLE MIRABELLI
Assistant United States Attorney
NY Bar No. 5663166
U.S. Attorney's Office for the District of Columbia
601 D Street N.W., Room 6.725
Washington, D.C. 20001