## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-642 (JDB)** |
| **v.** | : | |
| | : | |
| **DARRELL NEELY,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Darrell Neely to 33 months' incarceration, one year supervised release, 60 hours' of community service, and $844.93 in restitution. A sentence of 33 months is at the midpoint of the Guidelines Range of 30 to 37 months. As explained below, because Neely has multiple counts of conviction, this Court can and should sentence Neely to consecutive sentences to reach a total sentence within the Guidelines Range. U.S.S.G. § 5G1.2.

### I.      Introduction

Defendant Darrell Neely, the 53-year-old self-described host of the "Global Enlightenment Radio Network," participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is

This Court found Neely guilty at trial of violating 18 U.S.C. § 641, 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G).  As explained herein, a substantial jail sentence is appropriate in this case because Neely: (1) filmed violent scrums between police and rioters in the West Plaza that added to the chaos; (2) spent over an hour inside the U.S. Capitol, smoking and encouraging other rioters to "pack 'em in"; (3) brazenly stole "souvenirs" from the riot—a U.S. Capitol Police baseball hat and jacket, which had affixed to it a nameplate, badge, and U.S. Capitol Police patch; (4) has attempted to use his purported journalist persona to shield himself from the consequences of his actions, but used his platform to stream his disruption of Congress and to gleefully brag to his viewers about his crimes; (5) absconded from justice and attempted to stash the U.S. Capitol police patch with his romantic partner in North Carolina; (6) has spun knots of obfuscation and lies throughout this case; and (7) remains utterly unremorseful for his criminal conduct on January 6.

The Court must also consider that Neely's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Neely's crimes on January 6, his subsequent attempts to obstruct justice, and his utter lack of remorse render a significant jail sentence of 33 months both necessary and appropriate in this case.

---

also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.       Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the Government refers to the testimony at trial describing the attack on the U.S. Capitol.

*Defendant Neely's Role in the January 6, 2021 Attack on the Capitol*

As this Court is familiar with Mr. Neely's conduct on January 6, 2021 from the four-day bench trial, the Government briefly summarizes the relevant facts here.

Darrell Neely livestreamed some of his time on restricted Capitol grounds and inside the Capitol building on January 6, 2021, to his "radio network," the Global Enlightenment Radio Network.  That day, Neely wore a distinctive green and maroon colored-jacket, a gray backpack, a gray beanie, and at times, a black gator.  *See* Image 1.



*Image 1: Neely, center, films the police line while holding a "Trump 2020" flag (GX 436)*

Neely was present on the West Front of the Capitol as it was besieged by rioters.  At approximately 1:30 p.m., in the Lowest West Terrace, Neely was hit by downwind pepper spray.

About ten minutes later, at approximately 1:40 p.m., Neely used his mobile telephone to record video of rioters passing over him a large billboard with a "Trump" sign, which Neely saw rioters then use as a battering ram against a line of police officers.[2]  After this incident, Neely observed the crowd surrounding and attacking U.S. Capitol Police ("USCP") Officer Seth Carll and the officers of the Metropolitan Police Department ("MPD") Squad 42 near the Northwest scaffolding.[3]  Neely saw another rioter take a USCP-issued baseball hat from Officer Carll's head and throw it into the crowd, where Neely picked it up and told another rioter, "We got the hat." *See* Image 2.



*Image 2: Neely proudly displays a USCP ballcap to another rioter, moments after Neely saw another rioter rip the hat from Officer Carll's head (GX 406)*

---

[2] The Court acquitted Neely of pushing on that billboard with the intent to obstruct, impede, or interfere with those officers.

[3] The Court likewise acquitted Neely of joining the crowd's physical altercations against those officers the intent to obstruct, impede, or interfere with them.

Neely ascended the Northwest stairs and entered the Capitol through the broken Senate Wing Door at 2:24 p.m., only about 11 minutes after it was first breached by other rioters.   Neely followed the crowd to the Crypt Lobby, which officers attempted, but failed, to seal off in the face of the large mob of advancing rioters.   About 20 minutes earlier, USCP Officer Raymond Watts III left his USCP cruiser jacket in the Crypt Lobby as he decontaminated from exposure to chemical irritants.   Officer Watts' jacket had attached to it a nameplate, badge, and a USCP patch. When Neely passed through the Crypt Lobby, Neely picked up the jacket and stuffed it in his gray backpack.   *See* Image 3.   On his simultaneous livestream, Neely celebrated the riot and its goal to subvert the election ("No more Biden," "We have stormed the Capitol") and jeered those attempting to defend the Capitol ("[M]y U.S. Capitol Jacket is in my hand.   Thank you, officer dimwitted.").   *See* GX 809.



*Image 3: Neely holds a cruiser jacket with a U.S. Capitol Police patch after he leaves the Crypt Lobby, at approximately 2:30 p.m. (GX 107)*

At approximately 2:48 p.m., Neely returned to the Senate Wing Door.  After watching police officers struggle to repel rioters, Neely stood by the broken-out window, lit up a cigarette, and goaded rioters to stay, stating, "Nobody leave.  Pack 'em in, bigger."  *See* Image 4.



*Image 4: Neely smokes a cigarette moments before he goads rioters to stay (GX 420 at 0:38)*

Neely then went back into the Capitol and spent almost another half hour in the Crypt. Neely finally left the Capitol through the Memorial Door at approximately 3:34 p.m.—only after being led out by officers and after over an hour inside.

*Neely's Post-Riot Statements*

On a livestream the evening of January 6, Neely celebrated the day's events and jeered Vice President Pence's decision to certify the election, stating "[H]ow wonderful it was being downtown, seeing democracy in action, and watching Pence puss out."  GX 810.  Neely's ex-wife saw that Neely had brought home a U.S. Capitol Police jacket and took a picture of it later that month.  *See* Image 5.  On January 8, 2021, on another livestream, Neely wore the USCP hat and bragged about his spoils.  *See* Image 6.



*Image 5: Neely's ex-wife takes a photo in late January 2021 of some of the "souvenirs" Neely had brought back to her home from his time in the Capitol (GX 512)*



*Image 6: On a January 8, 2021 livestream, Neely sports the stolen USCP hat and boasts, "I ain't got the handcuffs but I got the hat" (GX 606 at 49:20)*

Neely voluntarily interviewed with the FBI agents twice before his arrest: on January 29, 2021 and June 18, 2021.  Neely admitted to being inside the Capitol but attempted to obfuscate his conduct through red herring conspiracy theories and self-serving falsehoods. For instance, Neely

claimed that he recognized individuals associated with Black Lives Matter, that he had to fit in to not be called Antifa or BLM, and that he helped carry a DC police officer out of the crowd.

In January 2021, Neely also showed the FBI agents his phone[4] and emailed select photos from outside the Capitol, writing (in a feigned attempt to commiserate) that he "cried because of what I witnessed at the Capitol because I have never seen so many sheep being led to harm an object that represents the peoples voice."  But in a livestream in June 2021, Neely told the truth to his followers: "I've proven who I am by going down there.  I've proven who I am by bringing in the jacket, by bringing in Capitol police officer, by bringing in the badge, by bringing in the information, by bringing in the flag Trump 2020, I've proven who I am."  GX 801.

*Neely's Arrest and Custodial Interview*

On September 30, 2021, the United States Attorney's Office charged Neely by criminal complaint with violations of 18 U.S.C.  §§ 641, 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D) and (G).  On October 18, 2021, the FBI arrested Neely at the Washington Field Office.  During his custodial interview, Neely admitted to being inside the U.S. Capitol and taking a baseball cap and jacket, but falsely claimed (among many other things): (i) he returned a USCP jacket as he was pushed out of the Capitol building but took a different, abandoned jacket with a USCP patch ("It was a black jacket.  Security officer's.  It was fun."); (ii) the items Neely stole were "memorabilia," "souvenir[s]," and his "memor[ies] from January 6," likening his actions to taking debris from the World Trade Center wreckage; and (iii) he threw everything away when he left the Capitol except for the USCP patch, which he claimed was at his mother's house.  *See* GX 807 at 14:00, 26:00, 30:30.

---

[4] Neely does appear to have shown the agent what appears to be part of a livestream video from inside the Capitol.

*Neely's Flight to North Carolina*

The case proceeded towards an October 5, 2022 trial date.  In August 2022, Neely's pretrial supervising officer lost contact with Neely, who had earlier told the officer that he was in North Carolina to search for housing for his mother and aunt. ECF No. 46.[5]

On August 10, 2022, a bench warrant was issued for Neely in a different criminal case in D.C.  *Id.*  Asserting that Neely appeared to be a fugitive, the Government filed a motion seeking to revoke Neely's release, and the Court held a status conference on September 13, 2022.  Neely failed to attend that status conference, but instead called in.  The Court held a further status conference on September 21, 2022, and required Neely's appearance in person.  Neely failed to appear at the September 21, 2022 hearing, and the Court issued a bench warrant for his arrest.  *See* ECF No. 63.  Law enforcement officials arrested Neely in Greensboro, North Carolina in late September 2022 and transported him back to D.C. on the bench warrant.

The evidence at trial showed that Neely, his mother, and his aunt had in fact been staying with Neely's intimate partner, Lori Hargett, in Greensboro, North Carolina.  After Hargett kicked out Neely and his family members from her apartment, she went through the belongings they left behind.  In her bedroom closet, where Neely had been staying with her, Hargett discovered a trash bag containing clothes, other personal items, and a USCP patch.  In September 2022, Ms. Hargett reported the patch to the FBI and agents recovered the patch from her.

---

[5] The report's reference to South Carolina appears to be an error.  In addition, to correct defense's suggested amendment to ¶ 29 of the PSR, Neely's family home in Washington, DC burned down in December 2021 (eight months before Neely lost contact). PSR ¶ 116.  Neely and his family stayed with a romantic partner in Maryland until approximately June 2022, before they left for North Carolina.

*The Trial*

On October 12, 2022, Neely was charged in a six-count Superseding Indictment with violations of (1) 18 U.S.C. §§ 231(a)(3) and (2); (2) 18 U.S.C. § 641; (3) 18 U.S.C. § 1752(a)(1); (4) 18 U.S.C. § 1752(a)(2); (5) 40 U.S.C. § 5104(e)(2)(D); and (6) 40 U.S.C. § 5104(e)(2)(G). This Court held a four-day bench trial between May 22 and 25, 2023. At the conclusion of the trial, this Court rendered a verdict finding Neely guilty on all but the first count.

*Neely's Post-Trial Interview*

On June 26, 2023, Neely called into an interview hosted on the streaming platform Rumble titled, "Justice in Jeopardy."[6] Neely disparaged this Court's decision to hold Neely in custody pending sentencing (9:00), but predicted, "I got more than enough in to secure these misdemeanors so the judge is going to have to release me." *Id.* 10:13. Neely claimed that January 6 defendants like him were "being detained, because we are a threat to the United States government and Nancy Pelosi and the rest of the liberal press and media and the liberal corporate industrial complex. We, January 6ers, are guilty of nothing but being patriots." *Id.* 13:27. Neely repeatedly characterized his actions (*i.e.* his crimes) as those of a free "press," and instead blamed police officers for the violence that day. *See id.* at 15:18, 16:56, 19:20 ("Sometimes acting a little outside of the norm is what is needed to get closer to a story and truth, or to find more leads or to gain more information. That's what I did."). Neely underscored his belief that the "legal system has been compromised and [the supposed corporate-industrial media complex's] next step . . . is to remodel the constitution to end the idea of it protecting us from the overpowering government." *Id.* 26:01.

---

[6] *https://rumble.com/v2wbtk8-j6-exclusive-darrell-neely-capitol-gern.html*

### III.    Statutory Penalties

Neely now faces sentencing on five misdemeanors. Neely faces up to one year of imprisonment and a fine of up to $100,000 on each of Counts 2 through 4 in the Superseding Indictment, 18 U.S.C. §§ 641, 1752(a)(1), and 1752(a)(2).  Neely faces an additional six months' imprisonment and fine of up to $5,000 on each of the remaining two counts of the Superseding Indictment, 40 U.S.C. §§ 5104(e)(2)(D) and (G).  Neely may also be ordered to pay restitution.

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46. "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.

The Government agrees with the Sentencing Guidelines calculation set forth in the PSR, with one correction noted below. According to the PSR, the U.S. Probation Office correctly calculated Neely's total offense level under the Sentencing Guidelines as follows:

*GROUP 1 (Count 2 – 18 U.S.C. § 641)*

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| Specific Offense Characteristics (U.S.S.G. §2B1.1(b)(3)) | +2 |
| Adjustment (U.S.S.G. §3A1.2(a)(1)(A)) | +3 |
| Adjustment (U.S.S.G. §3C1.1) | +2 |
| GROUP 1 SUBTOTAL | 13 |

***GROUP 2 (Count 3 – 18 U.S.C. § 1752(a)(1); Count 4 – 18 U.S.C. § 1752(a)(2))***

| | |
|---|---|
| Base Offense Level for Count 4 (U.S.S.G. §2A2.4(a)) | 10 |
| Adjustment (U.S.S.G. §3C1.1)) | +2 |
| GROUP 2 SUBTOTAL[7] | 12 |
| | |
| Greater of Offense Levels Above (U.S.S.G. §3D1.4) | 13 |
| Multiple Count Adjustment (U.S.S.G. §3D1.4(a)) | +2 |
| **TOTAL OFFENSE LEVEL** | **15** |

*See* PSR at ¶¶ 38–69.

The U.S. Probation Office correctly calculated that Neely has criminal seven criminal history points, which places him in Criminal History Category IV. PSR ¶ 80. Under a total offense level of 15 and Criminal History Category IV, Neely's Guidelines range is 30 to 37 months.

The PSR correctly applied the two-point adjustment for obstruction of justice under U.S.S.G. §3C1.1. PSR at ¶¶ 33-35. U.S.S.G. §3C1.1 applies where "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct . . . ." An enhancement under §3C1.1 "is only appropriate where the defendant acts with the intent to obstruct justice." *United States v. Henry*, 557 F.3d 642, 646 (D.C. Cir. 2009). "However, where a defendant willfully engages in behavior that is inherently obstructive-that is, behavior that a rational person would expect to obstruct justice- [the D.C. Circuit] has not required a separate finding of the specific intent to obstruct justice." *Id.* As the PSR notes, Neely acted to obstruct justice in two ways. PSR at ¶¶ 33-35.

_____

[7] The Group Two calculation reflects the calculation for Count Four, which has the higher offense level of the two counts. For Count Three, the Government calculates the offense level as 8 points (base offense level of 4, U.S.S.G. §2B2.3(a), two-point specific offense characteristic under U.S.S.G. §2B2.3(b)(1)(A)(vii), and the two-point U.S.S.G. §3C1.1 adjustment).

First, after his arrest and charging, Neely attempted to conceal material evidence of his theft—in particular, the U.S. Capitol Police patch he took from Officer Watts' jacket.   The application notes state that U.S.S.G. § 3C1.1 applies to "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so." U.S.S.G. § 3C1.1 n.4(D); *United States v. Maccado*, 225 F.3d 766, 769 (D.C. Cir. 2000) (application notes are treated as "authoritative"). For purposes of § 3C1.1, "'[m]aterial' evidence, fact, statement, or information . . . means evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 n.6; *United States v. Smaw*, 993 F.2d 902, 904 (D.C. Cir. 1993) (noting that the term "material" in USSG § 3C1.1 "means relevant-not outcome determinative."). The patch, which linked to Neely is direct evidence of the offense of conviction, undoubtedly meets this low standard. In fact, it was the only one of the stolen items recovered. Neely also attempted to "conceal" or "procur[e] another person . . . to conceal" the patch when he stashed it in Lori Hargett's closet in the summer of 2022. The plain meaning of "conceal" is "to prevent disclosure or recognition of" or "to place out of sight." "Conceal," *Merriam-Webster's Ninth New Collegiate Dictionary* (9th ed.) Neely knew about the patch's relevance to this case because the FBI had asked about it months earlier. Accordingly, Neely's decision to both bring and leave the patch in North Carolina, hundreds of miles from Washington, bespeaks his intent to hide the patch from the FBI and to willfully obstruct justice. *United States v. Mellen*, 89 F. App'x 268, 270 (D.C. Cir. 2004) (affirming application of obstruction enhancement where defendant, among other things, advised her daughter to destroy stolen government property to avoid detection and personally destroyed other equipment); *United States v. Lamere*, 980 F.2d 506, 515 (8th Cir.

1992) (affirming application of obstruction enhancement in counterfeiting case where defendant attempted to conceal counterfeit currency by moving it).

Second, Neely also willfully failed to appear before this Court when ordered to do so. U.S.S.G. § 3C1.1 also applies to "escaping or attempting to escape from custody before trial or sentencing; or willfully failing to appear, as ordered, for a judicial proceeding." U.S.S.G. § 3C1.1 n.4(E).  Central to the inquiry of willfulness is knowledge of court orders and the conscious decision to ignore that mandate.  *See United States v. Taylor*, 997 F.2d 1551, 1560 (D.C. Cir. 1993).  In late summer 2022, Neely stopped contacting his pretrial officer, and the Government filed a motion to revoke Neely's release.  The Court ordered a September 13, 2022 hearing, "expect[ing] defendant to appear in person . . . ." ECF No. 57.  Neely failed to appear at that hearing in person and instead called in via counsel, "suggesting he knew how to contact her and when the hearing was."  ECF No. 63 at 3.  Neely "assured the Court that he would appear [in person] at a later hearing, agreeing to a September 21 date."  *Id.*  "But on September 21, Neely was nowhere to be found, and the Court ordered his arrest."  *Id.*; *see also* 9/21/22 Minute Entry.  Neely was arrested in North Carolina shortly thereafter.  Based on these facts, there can be little doubt that Neely knew he was under court orders to appear at both hearings and deliberately failed to do so.  For the September 21, 2022 hearing in particular, Neely himself assured the Court of his appearance, failed to appear (or even attempt to make contact) on the date, and had to be brought back to D.C. on a bench warrant days later.  It could not be more clear that Neely "willfully fail[ed] to appear, as ordered, for a judicial proceeding," and the obstruction enhancement applies.  *See also United States v. Reeves*, 586 F.3d 20, 23-24 (D.C. Cir. 2009) (affirming application of obstruction enhancement as both willful and "inherently obstructive" conduct where defendant

was aware of his arraignment, failed to appear, and was re-arrested on a bench warrant eleven months later).

The Government does object to the PSR's description of the sentencing options pursuant to U.S.S.G. §5G1.1.  PSR ¶ 153.  Specifically, citing U.S.S.G. §5G1.1(a), the PSR states that because the statutorily authorized maximum sentence for Counts 2, 3, and 4 (12 months) is less than the minimum guideline range, the guideline range is 12 months on each of those counts.  PSR ¶ 153. This is not correct.  As correctly stated in PSR ¶ 155, because Neely was convicted of multiple counts, if the court determines that a sentence higher than the statutory maximum for any single count is appropriate, the Court can impose sentences on multiple counts to run consecutively under U.S.S.G. §5G1.2. *See also id.* app. n. 1.  Under a Guidelines range of 30 to 37 months, no count carries an adequate statutory maximum that reflects Mr. Neely's conduct on January 6 as well as his subsequent obstruction of justice.  Accordingly, the Court can—and should—impose consecutive sentences on each count to get a total sentence of confinement within the Guidelines Range.  *See* U.S.S.G. §5G1.2.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.  Nonetheless, the United States requests that the Court find at sentencing that it would impose the same sentence under the § 3553(a) factors regardless of its rulings on any disputed guidelines issues.

## V.        Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 33 months' incarceration, one years' supervised release, 60 hours of community service, and $844.93 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F. Supp. 3d 1, 8 (D.D.C. 2021). While assessing Neely's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Neely, the absence of violent or destructive acts is not a mitigating factor. Had Neely engaged in such conduct, he would have faced criminal charges above and beyond his Civil Disorder charge.

As the Guidelines Range in his case reflects, Neely stands among the most culpable misdemeanants from the January 6 attack on the Capitol. Over hours in the afternoon on January 6, Neely added to the chaos attending the siege of the Building. As this Court found, on the West Plaza, Neely's "mere presence in the crowd, as well as his filming the crowd, added to the chaos and the danger that the police faced." Tr. 667. But Neely was more than just a passive observer—he was emboldened by the chaos. Moments after seeing the violence against MPD Squad 42 and Officer Carll and observing another rioter grab the baseball hat from Officer Carll's head, Neely claimed it for the mob ("We got the hat"). Indeed, Neely brazenly stole ***two*** different sets of

16

"souvenirs" clearly not belonging to him (the USCP baseball cap and USCP cruiser jacket with attached patch, badge, and nameplate) belonging to *two* different officers (Ofcs. Watts and Carll) in *two* different locations (the Northwest stairs and Crypt Lobby).

Neely spent over an hour inside the Capitol between the Senate Wing Door, Crypt, and Capitol Visitor Center.  Although he witnessed yet more violence inside and had ample opportunities to leave, Neely instead smoked and goaded other rioters near the Senate Wing Door, pleading "nobody leave, pack 'em in, bigger!"  Far from being an impartial journalist, Neely used his platform to stream the mob's disruption of Congress, celebrating "We have stormed the Capitol" and "No more Biden," and mocking those defending the Capitol as "officer dimwitted." GX 809.  In the days after, Neely gleefully bragged about his crimes to his viewers— "How wonderful it was . . . watching Pence puss out"—and wore the stolen hat as a badge of pride. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of significant incarceration in this matter.

### B.  The History and Characteristics of Neely

As set forth in the PSR, Neely has an extensive criminal history across three decades, including at least one felony conviction and convictions for theft, attempted theft, battery, simple assault, and menacing with a weapon.  PSR ¶¶ 71–79.  Neely has had over a dozen law enforcement contacts that have not resulted in a conviction, including pending drug and stolen property charges in North Carolina.  *See* PSR ¶¶ 82–99, 93.  Further, Neely has a track record of probation violations, bench warrants, and failures to appear.  PSR ¶¶ 73 (two alleged probation violations, two bench warrants, one reinstatement, one revocation), 74 (two probation violations, two bench warrants, two continuances of probation), 79 (August 10, 2022 bench warrant); 86 (arrested in DC on an Arizona probation warrant).

Neely reported to the PSR writer that he enlisted in the U.S. Navy in July 1992, was awarded a Purple Heart in 1996 or 1997 (from being shot in Afghanistan), a Navy Cross in 2005, and was honorably discharged in 2009.  PSR ¶¶ 120, 136.  Little of this appears to be true.  Based on military records the Government was able to obtain, Neely served on active duty in the U.S. Navy between July and September 1994, when he was administratively discharged following an alleged larceny incident.  From his time in active service, Neely appears to have been awarded the National Defense Service Medal.  Neely then joined the Navy reserves between April and October 2001, when he was separated for unsatisfactory performance.[8]  These records show that Neely was not in the military in 1996, when he claims to have been shot in Afghanistan and awarded a Purple Heart.  And they show that Neely was not in the military in 2005, when he purports to have been awarded the second-highest military honor, the Navy Cross.  Even as he faces sentencing, Neely appears to have told yet more lies (this time to Probation, an arm of the judiciary), and possibly committed further crimes.  *See* 18 U.S.C. § 704(b).

In short, Neely's history and background—especially his history of criminal conduct, non-compliance with court orders, and lies to Probation—support the need for a significant custodial sentence.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I

---

[8] Because reserve service records are kept separately, the Government was not able to timely obtain a record of any awards Neely may have received from his reserve service.

don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Neely has accepted no responsibility for his crimes and has shown a total lack of remorse for his actions.  In the days following January 6, Neely bragged about how "wonderful" January 6 was and wore the baseball hat he stole on a livestream, while also admitting in a private message that he had "destroyed and put away evidence from the Capitol" to avoid prosecution.  GX 604,

606, 810.  Although Neely initially communicated voluntarily with the FBI, Neely was not truthful about his conduct and, even after he was arrested, was not forthcoming about what he stole or where it was located.  On the other hand, Neely's lack of remorse was crystal clear—Neely insisted he was entitled to his "souvenirs" from the Capitol and that it was "fun".

Even after his conviction at trial, Neely shows a complete lack of remorse.  In his June 26, 2023 interview, Neely claimed that "[w]e, January 6ers, are guilty of nothing but being patriots." https://rumble.com/v2wbtk8-j6-exclusive-darrell-neely-capitol-gern.html at 13:27.  Neely continues to claim—despite all the evidence to the contrary—that he went to the Capitol as a member of the media and blamed police for the very violence to which he contributed.  *Id.* 15:07 ("I went there as press. Independent, free press."), 18:57.  And he continues to espouse the same conspiracy theories that brought him to the Capitol as a mob member in the first place. *Id.* 26:01-27:00.

A significant custodial sentence is also necessary to address Neely's lack of respect for the rule of law.  As discussed *supra*, Neely has an extensive criminal history that follows similar patterns, particularly for domestic violence-related crimes—for one of which, he appears to have served a total jail sentence over 14 months.  PSR ¶ 73.  Indeed, only weeks after his conduct at the Capitol, Neely violently assaulted his domestic partner, and ultimately pled guilty.  PSR ¶ 79.  But even as he bench warranted on that case in the summer of 2022, Neely picked up three sets of charges in North Carolina, one of which is still pending.  PSR ¶¶ 91–93.  Having been convicted of five misdemeanors and spent 10 months in custody, Neely now expects to escape the consequences of his actions, telling his interviewer, "[this Court] is going to have to release me."[9]

---

[9] https://rumble.com/v2wbtk8-j6-exclusive-darrell-neely-capitol-gern.html at 10:13.

On top of his poor track record, Neely's conduct in this case makes clear that he will not comply with a sentence other than substantial incarceration.  As this Court is well aware, Neely fled to North Carolina in the summer of 2022, had a bench warrant issued in his domestic violence case, and stopped contacting his probation officer.  In the apparent hope that it would not be found, Neely stashed the U.S. Capitol Police patch that the FBI had asked about months before with his intimate partner.  Neely's choices must have consequences, as this Court made clear after revoking his pretrial release for willfully failing to attend court.  ECF No. 63.  Yet, even now, Neely has not been truthful to Probation during the preparation of his own PSR.  PSR ¶¶ 120, 129 n.3, 136, n.4.  It is clear that Neely's ten months of incarceration have not instilled a respect for the judicial process, and so a more substantial sentence is appropriate.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on police officers, to conspiracy to corruptly interfere with Congress.[10] This Court must sentence Neely based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Neely was found guilty of Counts 2 through 6 of the Indictment, charging him with 18 U.S.C. § 641, § 1752(a)(1) and (2), and 40 U.S.C. § 5104(e)(2)(D) and (G).  These offenses are Class A and B misdemeanors to which the sentencing factors set forth in 18 U.S.C. § 3553(a) apply.  Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall*, 552 U.S. at 54. In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id.* ("A

sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Aaron Mostofsky*, 1:21-CR-00138 (JEB), the defendant forcibly obstructed officers who were attempting to adjust barriers in the West Terrace area to keep rioters from entering the Capitol building.  Mostofsky stole a Capitol Police bullet-proof vest, then entered the Senate Wing Doors, where he stole a riot shield that another rioter had left.  Mostkofsky pled guilty to violating 18 U.S.C. § 231(a)(3), U.S.C. § 641, and 18 U.S.C. § 1752(a)(1).  Now-Chief Judge Boasberg sentenced Mostofsky to 8 months concurrent custody on each count, 12 months supervised release on each count, 200 hours community service, and $2,000 restitution. While Neely is not convicted of violating 18 U.S.C. § 231, the parties in that case calculated the Guidelines Range as just 12-18 months.[11]   This disparity reflects many differences between the two cases, including (i) Mostofsky's decision to accept responsibility; (ii) Neely's substantial

---

[11] Acknowledging a potential error in the grouping analysis, Chief Judge Boasberg stated he would impose the same sentence regardless of the Guidelines range.  Sentencing Hearing Tr. 4:6-5:6, *United States v. Aaron Mostofsky*, 21-cr-138-JEB (May 6, 2022).

criminal history (Mostofsky was Category I); and (iii) Neely's obstruction of justice by willfully failing to appear in court and attempting to conceal evidence.  Mostofsky also presented evidence of his positive contributions to his community at his sentencing.  *United States v. Aaron Mostofsky*, ECF 101 at 6-13, 21-cr-138-JEB (D.D.C).  Neely's substantial criminal history alone supports a much higher sentence for him than for the never-previously arrested Mostofsky.

In *United States v. Tommy Frederick Allan*, 21-cr-64-CKK, Allan entered the Capitol though a fire door next to the Senate Parliamentarian's office, entered the Parliamentarian's office, stole a large American flag, and entered the Senate itself and stole papers from the dais.  Like Neely, Allan bragged about his exploits and proudly displayed the stolen documents in a video posted to Facebook. When he returned home, Allan deleted his Facebook account and destroyed the documents he had stolen in an effort to hide the evidence of his unlawful conduct.  Allan pled guilty to violating 18 U.S.C. § 1512(c)(2) and was sentenced by Judge Kollar-Kotelly to 21 months' incarceration, 36 months' supervised release, and $2,000 restitution.  The parties in that case agreed that the Guidelines range was 21 to 27 months, and likewise applied the obstruction enhancement.  While Allan's felony conduct in entering and stealing papers from the Senate is more serious than Neely's (as reflected in the higher offense level in that case), Neely's higher Guidelines Range reflects his lack of acceptance of responsibility and significant criminal history (Allan was Category I).

The Government acknowledges that Timothy Williams, who also stole U.S. Capitol Police items, received a sentence of 6 months' incarceration; the government had recommended 15 months. *United States v. Timothy Williams*, 22-cr-265 (RC).  Williams looted a U.S. Capitol Police Officer's riot helmet and bag, kept possession of this equipment until after the entry of his guilty plea, and lied to the FBI about stealing these items.  Williams, however, (i) spent less time in the

Capitol than Neely (35 minutes versus over an hour); (ii) did not bench warrant in his case, and (iii) accepted responsibility through his plea to misdemeanor charges of violating 18 U.S.C. § 641 and 18 U.S.C. § 1752(a)(1).   Accordingly, based on Williams' Category IV history, the parties had calculated a 12- to 18-month guideline range, around half of the range in Neely's case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d

at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Neely was convicted of multiple offenses under Title 18 and an offense against property, both the VWPA and MVRA apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors

26

as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Because Neely engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Neely responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

In addition, Neely was convicted of stealing U.S. Capitol Police ballcap (for which U.S. Capitol police provided a $12.00 acquisition cost), Officer Watts' badge ($43.80 valuation), and his nametag ($10.45 valuation). *See* Exs. 1 and 2.[13]   Although the Superseding Indictment did

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

[13] The Government does not currently have a valuation amount for the U.S. Capitol Police patch.

not allege that Neely stole Officer Watts' cruiser jacket, the evidence at trial proved by a preponderance of the evidence that Neely stole that jacket and later removed the components from it (the badge, nametag, and patch)—of which the Court convicted Neely. The testimony also showed that USCP was required to issue a new cruiser jacket to Officer Watts.  In other words, USCP's losses relating to the theft of the jacket are directly and proximately caused by the offense of conviction (Neely's theft, specifically of the badge, nametag, and patch). *See generally* 18 U.S.C. §§ 3663(a)(1)(A), 3663A(c)(1)(A)(ii); U.S.S.G. §5E1.1(a).   Accordingly, the jacket's value ($278.68) should also be included in the restitution amount.

In sum, the Court should require Neely to pay $500 in restitution to the Architect of the Capitol for his convictions on Counts 3 through 6 and $344.93 to U.S. Capitol Police for his conviction on Count 2. This amount fairly reflects Neely's role in the offense and the damages resulting from his conduct.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 33 months' incarceration, one year supervised release, 60 hours of community service, and $844.93 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
U.S. Attorney's Office for the District of Columbia
601 D Street, NW
Washington, D.C. 20001
(202) 252-7669
Michael.Barclay@usdoj.gov

KYLE MIRABELLI
Assistant United States Attorney
NY Bar No. 5663166
U.S. Attorney's Office for the District of Columbia
601 D Street N.W., Room 6.725
Washington, D.C. 20001

<u>**CERTIFICATE OF SERVICE**</u>

On this 30th day of August 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<div style="margin-left:50%">

 /s/ *Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
U.S. Attorney's Office for the District of
Columbia
601 D Street, NW
Washington, D.C. 20001
(202) 252-7669
Michael.Barclay@usdoj.gov

</div>