## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**     :

                      :

       **v.**                 :

                      :     **Case No. 21-CR-642(JDB)**

**DARRELL NEELY.**         :

                      :

    **Defendant.**          :

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Darrell Neely,  through his attorney,  Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), respectfully submits this memorandum to aid the Court at sentencing and hereby notifies the Court that he has received and reviewed the Presentence Report ("PSR") prepared in this case.  After carefully reviewing the  final PSR with Mr. Neely, the defense has additional objections.[1]  These additional objections are to paragraphs 58 and 59 of the final PSR.

The defense does not disagree that a 2 level enhancement is warranted for obstruction of justice (paragraph 33) but this is  because Mr. Neely absconded. *See* USSG Section 3C1.1, application note 4, Examples of covered conduct (E) …"willfully failing to appear, as ordered, for a judicial proceeding."  The defense objects to the government's reason that it was because Mr. Neely "concealed the

---

[1] Undersigned counsel informed the probation officer and the United States that Mr. Neely would be objecting to paragraph 58 of the PSR on August 20, 202 via email. The defendant also objects to paragraph 59.

U.S. Capitol Police patch that he stole from the Capitol." *See* ECF No. 107, p.1. This concealment took place before October 2021, when there was an indictment in the case.[2]

The defendant objects to paragraph 58. There is no evidence to support the probation officer's statement that "Mr. Neely saw the another (sic) rioter steal a hat from Officer Carll's head, and then pick up the hat after it was thrown to him..." The evidence at trial is that Mr. Neely was filming the scene and there was no evidence he saw the hat taken off of Officer Carll. There is no evidence that the hat was thrown to Mr. Neely specifically. Mr. Neely exclaimed "we got the hat." He was not addressing any particular person.

The defense objects to paragraph 59. The victim related adjustment does not apply.  Finally, with regard to sentencing on multiple counts, the counts here are so closely intertwined with the other offenses that generally would not warrant increasing the guideline range. Convictions on multiple counts do not result in a sentence enhancement unless they represent additional conduct that is not otherwise accounted for by the guidelines.[3]

---

[2] In *United States v. Ruballo*  a case where the enhancement was applied, the defendant was destroying evidence during the execution of a search warrant. And "only a fraction of the [deleted ] material was recovered." 833 Fed. Appx 275, 280 (11th Cir. 2020). The defendant also shredded key evidence after the defendant learned the investigation was in full swing. *Id* Mr. Neely had no idea he would be charged at the time he is alleged to have taken the patch.

[3] The theft count should not be grouped as it is separate conduct.

The defendant maintains that the offense level is 14 and a criminal history category of IV, making the guideline range 27-33 months. This criminal history category over represents the actual criminal conduct in the defendant's criminal history, which is almost all misdemeanor convictions, and respectfully requests a variance downward from the Guideline range.   For the reasons set forth herein, Mr. Neely requests that this Honorable Court impose a sentence of a period of time served,[4] one year of supervised release,  60  hours of community service and $500 restitution to account for:

1.      His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his presence as a reporter, his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building;

2.      His being subjected to a felony offense for which there was no evidence to support simply because he absconded,  and

3.      To avoid disparate sentences in similar cases.

## I.      <u>Background</u>

Mr. Neely is a journalist.  He has a degree from Howard University in Radio Television and Film and has been the host of his own online show for many years.

---

[4] 18 U.S.C. 3582 provides that the imposition of a term of imprisonment is subject to the following limitation: "in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means of promoting correction and rehabilitation.

Mr. Neely did not just wake up on January 6th, 2021 and decide it would be a good day to start his journalism career. He had been at it for years with an audience of people depending on him for news reporting of the events that day. Indeed, he came to the Capitol to report on the events of that day and live stream his reporting. As Mr. Neely approached the Capitol grounds on January 6th, the barricades and signs were already down and he had an open pathway up to the inaugural stage area where people were gathering. He observed, as a journalist would, protestors getting in the faces of law enforcement officers much like they did at other protests in the District of Columbia throughout 2020. As Mr. Neely reported on the events he saw, he observed and filmed others yelling at officers. But Mr. Neely was peaceful. He did not engage officers or scream in their faces. He stood still with his phone up reporting the events. He dressed in street clothing. He did not have a weapon. He didn't have Trump gear or a Trump flag. He was

capturing the story.



*FIGURE 1*

For merely filming these events, Mr. Neely was sprayed in the eyes by law enforcement with some sort of chemical spray.[5]  He recoiled in pain, wiping his eyes as he turned around.  Some others in the crowd attempted to help him.

Shortly after this incident, a Trump sign began to make its way across the crowd.  Mr. Neely had no part in the process as it moved through the crowd.  It was passed from far down the crowd towards Mr. Neely without his knowledge.  But when it passed by him, he decided to film it.  He didn't reach to help it along or encourage others to push it or pull it in any way.  He held his phone up towards

---

[5] Many peaceful protestors were sprayed with pepper spray that day, including other clients of undersigned counsel.

the Trump sign.  As the sign made passed over his head, he raised his phone up to

capture the moment.



*FIGURE 2*

After recording this incident, he made his way nearer to the Capitol heading

to the lower west terrace near the stairs.  He didn't interact with the officers.  He

filmed with his phone.  He saw other press people recording the situation just as he

was doing for his own radio program.  Mr. Neely was live streaming that day to an

audience and listeners who were awaiting reports of what was happening at the

Capitol.

One video shows Mr. Neely saying on the grounds  "we got the hat" as he

holds up a Capitol Police baseball cap.  Now it is important to note that Mr. Neely

didn't steal the hat or pull that hat off the head of that officer. It was someone else

in the crowd.  A total stranger to Mr. Neely.  As can be seen in the figure below, Mr. Neely could not see the hat being stolen at this angle nor was he filming the incident.  The hat is well below Neely's line of eyesight and his phone is pointed upward.



*FIGURE 3*

Mr. Neely in no way encouraged the stranger to take the hat. Nor did Mr. Neely call out for it to be passed to him as he was not even aware it was happening.  As fate would have it, that hat was pulled off by the protestor and tossed in the air.  It bounced around randomly and landed on the ground near Mr. Neely.  Then Mr. Neely picked it up. The government claims that this behavior

constituted stealing that hat.  Mr. Neely claimed at the trial that he found the

discarded item and picked it up.  His  statement "we got the hat" captured on video

was his repeating what another protestor had said just beforehand, not a statement

of independent knowledge regarding the source or the incident that had just



occurred.

*FIGURE 4*

It was about this time in the day that Mr. Neely encountered a woman in a

pink beret.   She plucked an unsuspecting Mr. Neely from the crowd and walked

with him up the stairs towards the North West Terrace of the Capitol.  She held his hand, filmed with her phone and laughed and spoke with Neely.



*FIGURE 5*

Mr. Neely and the woman now  known as Jennifer Vargas Geller, entered the Capitol through the Senate Wing Doors at approximately 2:24pm.  They walked in hand in hand, smiling and stopping to film.  By all accounts she was a stranger to Mr. Neely, yet she led Mr. Neely through the Capitol acting as his personal tour guide.



*FIGURE 6*

Thereafter the two made their way to the Crypt lobby.  Neely briefly separated from her.  While he was gone she made her way to an area with clothing and officer gear left lying around and left behind by officers who had fled the area. She filled a backpack full of this stuff and walked around the hall with the filled

backpack.





*FIGURES 7&8*

Only after she encountered Mr. Neely again did she hand that backpack over to him and he walked it directly to an officer to return it in the Crypt. We don't know what was said between them, but clearly Mr. Neely discerned that her bag contained property that he knew did not belong to her.



*FIGURE 9*

Mr. Neely took charge of the process of taking that backpack back to the officers, not Ms. Vargas Geller.

Thereafter Mr. Neely went to the lower level Capitol Visitor's Center where Ms. Vargas Geller ditched him.   Could it be she didn't like the fact that Mr. Neely made her return her pirate's booty?  She left him distracted at the side of the lobby area and then made her escape up the escalator, crouching down and removing her

pink beret as she did to further hide from his sight.



*FIGURE 10*

Mr. Neely hung around the basement of the Capitol Visitor's Center looking for her, and then eventually made his way up to the Crypt.  He stood there for several minutes surrounded by officers who never once told Mr. Neely to leave the area.   In fact, Mr. Neely spoke with several officers in a calm manner for several minutes and thereafter stood there in plain sight of the same officers.  Not once was he asked to leave the area.  At trial it was shown that over eleven officers were surrounding the area where Neely remained and not one approached him or asked him to leave.



*FIGURE 11*

## II.   <u>Neely's arrest</u>

When arrested,  Neely  voluntarily spoke to the FBI again and gave a

detailed statement of the offense in which he admitted that he entered the U.S.

Capitol building long before he was charged.  He also gave the FBI information

about others, especially Ms. Vargas Geller, whom he'd told them about the first

time he was interviewed, yet there was no follow up by the FBI on her or others.

The FBI simply ignored what he told them even though there were multiple videos

confirming his story.  He believed he was helping law enforcement.  Mr. Neely

walked out of the building as directed, he did not cause any damage while inside or

outside, he told officers inside that he was with the press, nor did he engage in any

violence. He did not enter the House or Senate Room floor. His whole purpose in

being at the Capitol was to report to his listeners what was happening. He had no political ax to grind.

Yet Mr. Neely, like thousands of others,  had no idea he was being used as a pawn in a game far more sophisticated and complex than anyone could imagine. He was a perfect pawn for the agitators in the crowd.  Consider that it took the January 6th House Select Committee more than a 1000 individual interviews and nearly 2 years  of investigation, to parse through to what they believe  is some truth about what transpired that day.    He came to the Capitol with no intent to do anything but live stream for his broadcast and company. He did not suit up for combat.  He did not obscure his face.  He was not armed.  He wore street clothing. He did not carry anything.  He came alone.  He committed no violent actions in his walk through the Capitol.    He treated law enforcement officers with respect.  He did not destroy anything.  His desires were work related, with no intent to commit any sort of crime.

### III.    THE TRIP TO THE CAPITOL AND JANUARY 6, 2021    .

### A.  Mr. Neely's activities inside and outside the Capitol.

For some time, police were able to fend off the crowd, but as we now know, some rioters instigated a push to overwhelm the few, undertrained, under equipped

and unprepared police.[6] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This breach was well before Mr. Neely actually entered the Capitol.  Hundreds preceded him in entering.

He was first interviewed by the FBI in March 2021 without a lawyer and without being mirandized. He was again interviewed in July of 2021 and gave the FBI more video evidence, thinking he was being helpful to law enforcement, being unaware he was sealing his own fate.  He told them what he knew, and sent them links to evidence after the interview. Finally, in October 2021, without counsel present  he was interviewed by the FBI but he was mirandized.  Mr. Neely told his story of being at the Capitol during these 3 interviews.  He never once refused to answer their questions. Mr. Neely did not show up for Court which triggered an arrest warrant being issued by this Court. That was wrong, and Mr. Neely knows it was. But for the government to then charge him with a felony without the evidence to support the charge, because they can, more than a year later to punish him for absconding, is wrong.[7] This is government overreach and

---

[6] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at
https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

[7] Defense counsel emailed the government on October 13, 2022 after the felony charge was added to the indictment and asked if more evidence had been discovered. Discovery was long completed. The government's response was

they should be precluded now from arguing for a stacked sentence because he was

acquitted of the felony. Undersigned counsel is unaware of any other J6 case

having a stacked sentence.

Mr. Neely has absolutely no history of political extremism.  He had

absolutely no expectation or knowledge of the consequences of others' actions that

day, nor the consequences that their actions would have on his being present.  He

was simply reporting what was happening in real time.

While he did not personally destroy anything, this Court found that he was

illegally on the  Capitol grounds, that he stole property belonging to Capitol police,

and that  illegally played a part in an unmanageable mob.  But he was non violent.

He didn't yell at police like those around him.  According to Ed Maguire, a

criminologist at Arizona State University, security forces are trained to ignore

yelled insults and small acts of hostility, like pushes and thrown water bottles. And

they receive training in absorbing surges in a crowd, moving people as gently as

possible, and quickly responding to pockets of violence and isolating agitators.

Benedict Carey, Making Sense of the 'Mob' Mentality, New York Times (Jan. 12,

2021), available at  https://www.nytimes.com/2021/01/12/science/crowds-mob-

psychology.html  Mr. Mr. Neely did not commit any of those actions, nor did the

_____

that they "obtained information that was previously unknown to us, namely, in regard to Mr. Neely's participation in
the group that pushed the large Trump sing into a row of officers."  What defense counsel does not understand, is
that was not evidence "previously unknown to the government."

government have any witnesses testify that Mr. Neely was violent in any way.  On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." *Id.*

Importantly, as for persons in the mob "With no apparent structure or strategy, the crowd had no shared goal or common plan." *Id.*  Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind… " There are many groups, doing different things, for different reasons."  He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." *Id.*

Unfortunately, Mr. Neely followed a large crowd rather than leave, not knowing how violent as a whole the mob would be independently of his own actions. Others, who were also part of the mob, had different and more violent plans that day of which Mr. Neely is now being associated with and always will be.

## IV.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant.

*See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence

imposed to: reflect the seriousness of the offense, promote respect for the law, and

provide just punishment; afford adequate deterrence to criminal conduct; protect

the public from further crimes of the defendant; and provide defendant with needed

educational or vocational training, medical care, or other correctional treatment in

the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets

forth the factors that the Court must consider in fulfilling this provision.[8]

## V.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but

not greater than necessary" in light of the factors identified in §3553(a).    *United*

*States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough*

*v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & circumstances of the Offense & the History and Characteristics of Mr. Neely

Mr. Neely is a son and a father. He wants to take care of his mother and

work to support his children.  The majority of his criminal history and his most

---

[8] 1.    The nature and circumstances of the offense and the history and characteristics of the defendant;
2.    The need for the sentence imposed;
3.     The kinds of sentences available;
4.    The kinds of sentence and the sentencing range…;
5.     Any pertinent policy statements issued by the Sentencing Commission;
6.    The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.    The need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a)(1-7).

recent criminal history has been with an ex wives or girlfriends.[9] For a period of 8

years, Mr. Neely had no criminal history which shows he is capable of following

the law. First, the defense is not aware of any evidence that defendant's entry into

the Capitol was violent in any way.  Second, he did not attempt to add to the

violence of the mob, although he did join the crowd at one point in chanting. Third,

there is no evidence that he engaged in any violence or questionable conduct

towards law enforcement, it was just the opposite. He was calm and respectful.

Fourth, based on the Government's investigation, it appears that he remained

in the Capitol building for about an hour.  The defense is not aware of any

evidence that he entered the Senate or House Chamber.  The government must

concede that he committed no violent acts and destroyed no property, even though

he may have been in the proximity of others doing such things. It may be that the

government has used the information he voluntarily gave the FBI in the

prosecution of others.  He is willing to assist the government in their prosecution of

Ms. Geller and testify if they need him. This is completely consistent with his

statements to them years ago. His actions within the Capitol have been tracked on

the CCTV footage and this footage demonstrates that while unlawfully present in

the Capitol with no excuse, he did not destroy property or commit violent acts.  He

---

[9] Mr. Neely has successfully completed probation and has also had a mental health evaluation recently in superior court..

did not suit up for combat.  He did not obscure his face.  He was not armed.  He did not yell at any police officers.  He wore everyday clothing.  By the time Mr. Neely arrived at the U.S. Capitol, the barriers that had been erected along the perimeter of the building were no longer present. This was shown at trial.  He met no resistance in his walk to and inside the Capitol. At the time,  being a journalist, Mr. Neely didn't dream he'd be charged for going into the Capitol or for simply being on the grounds. Without the encouragement and hand holding of Ms. Vargas Geller, Mr. Neely may never have gone inside.

This has obviously been a tough road for Mr. Neely and his family, especially his mother. He has taken care of his mother and his aunt for many years.     Yet he has suffered and been called out for his January 6 attendance at the Capitol in ways that cannot be undone.  He has been called names and accused of things as a result of his name being associated with Trump and the January 6th violence, even though he was not part of that violence.  The events of that day live on in social media.  It will be there forever and Mr. Neely will forever carry the taint of having been convicted of a crime associated with those events.  Worse, he will have to explain to his children what he did and why. He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished.  In sum, he has been punished already by his actions.

Mr. Neely does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo or the fact that he went to trial.  In determining what punishment is warranted, this Court should not lose sight  of the fact that he did no harm and intended no harm.  Since being incarcerated, Mr. Neely has been a model prisoner despite the fact that after being transferred to Lewisburg prison, his cell mate tried to kill himself and Mr. Neely was tasked with babysitting him. This caused Mr. Neely an exorbitant amount of stress which is further explained in the PSR. See paragraph  His exemplary behavior  while incarcerated shows that he is capable of being a  productive, law abiding citizen and the Court can rely on that as a basis to sentence  him  to a term of time served and a term of supervised release considering the 3553 factors.[10]

**B. Need for the Sentence imposed**

1. **General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct**

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be a  need for incapacitation which has already occurred.  The public will be  and is being adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and

---

[10] Mr. Neely has written articles, books and taken classes while incarcerated. He has no infractions.

collateral consequences attendant to even a misdemeanor conviction for those

involved. Those who would not be deterred by these consequences are likely not

deterrable. Indeed, unnecessarily harsh sentences imposed upon those who were

less culpable will not encourage respect for the law or promote just punishment,

but are likely to  be counterproductive, and labeled as political posturing.  A

sentence of  time served, nearly the statutory maximum, with a term of supervised

release, does constitute punishment. Moreover, any term of supervision  will deter

others as one's liberty interests are curtailed by travel restrictions, reporting

obligations, and limitations on one's personal freedoms.  The National Institute of

Justice, Department of Justice, issued a summary of the current state of empirical

research stating that "prison sentences are unlikely to deter future crime," and

"increasing the severity of punishment does little to deter crime."  U.S. Dep't of

Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know*

*About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the*

*Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at

https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Mr. Neely's  likelihood of recidivism is really low, assuming he can get

along with his ex-wives.  His many statements to the FBI show his willingness to

cooperate  and exercising one's constitutional right to go to trial should not be used

against him.  Research has consistently shown that while the certainty of being

caught and punished has a deterrent effect, "increases in severity of punishments

do not yield significant (if any) marginal deterrent effects." Michael Tonry,

*Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three

National Academy of Science panels… reached that conclusion, as has every

major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of*

*the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An*

*Analysis of Recent Research (1999),* summary available at

http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned

by the British Home Office, examined penalties in the United States as well as

several European Countries. *Id*. at 1. It examined the effects of changes to both the

certainty and severity of punishment. *Id.* While significant correlations were found

between the certainty of punishment and crime rates, the "correlations between

sentence severity and crime rates…were not sufficient to achieve statistical

significance." *Id*. at 2. The report concluded that the "studies reviewed do not

provide a basis for inferring that increasing the severity of sentences is capable of

enhancing deterrent effects." *Id.* at 1. Given Mr. Neely's  age  and other issues

consistent with what is mentioned above, the likelihood that he would ever re-

offend is fairly low.[11] A punishment of any additional jail time in this case is going to have the exact opposite effect than what is in the interest of justice. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice. Mr. Neely urges the Court to impose a sentence of time served in this case in light of his his non-violent conduct at the Capitol and his ongoing cooperation with the FBI, and the lack of a need to further deter him.

### 3. Just Punishment

Particularly during this alleged post-pandemic, it is best for the community, as well as for Mr. Neely, that he remain outside of prison. He now has a federal conviction which, in and of itself, is quite punitive. The conviction and jailing caused him to lose his job, affects possible future job opportunities, and will remain with him for the rest of his life. But a sentence of time served will allow him to continue to work, show remorse and to help support his children - both financially and emotionally

Any term of supervision involves significant restraints on a defendant's liberty. Defendants must periodically report to the probation officer, permit the

---

[11] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

officer to visit their homes and jobs at any time, and follow the officer's advice. *Jones v. Cunningham,* 371 US 236, 242 (1963).  Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives.  *Ibid.*  Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison.  *Ibid.*

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation.  *Ibid.*  They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime.  *Ibid.* Supervised release significantly restrains defendants' liberty to do the things that free people in this country are entitled to do.  *Ibid.*

## B. <u>The kinds of sentences available</u>

A sentence of  continued  incarceration would result in sentencing disparity with other individuals who behaved similarly but were not similarly charged . <u>*See infra*</u>.[12]

---

[12] This does not include every case, just a sampling.

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's financial condition is modest as outlined in the PSR and he respectfully submits that he cannot pay a fine.

### C. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than time served, community service, and/or restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing  or are pending in this Court. Given sentences imposed in comparative cases, a sentence of time served is not unusual for misdemeanor cases and even some felony cases and is appropriate here.

In similar cases that went to trial, without the theft conviction, no defendant has received a stacked consecutive sentence and the case facts were much more egregious than Mr. Neely's conduct. In *U.S. V. Nassif,* 21 CR 421 (JDB),  the defendant received a downward variance and a sentence of seven months from this Court despite the fact that he lead chants, encouraged other rioters to keep fighting, waved people in and testified falsely at trial. *U. S. v. Santos, 21 CR 47(RDM),* a 4 month sentence was imposed. Mr. Santos posted a video selfie and said "we took over this mother------ we took over this capitol."[13] In *U.S. v. Alford*, 21 CR 263 (TSC) a 12 month sentence was imposed. Mr. Alford posted

---

[13] Mr. Mirabelli was also the prosecutor in this case and asked for a 21 month prison term.

two Facebook posts while in the Capitol about Ashley Babbit being shot. *See*

ECF 108, gov't sentence memo.  He also posted a photo saying "off with their

heads/stop the steal."  He mocked police officers comparing them to Paul Blart

the mall cop. Alford testified at trial and was not honest. *Id*. at p. 11-12. And in

*U.S. v. Rivera*, 21 CR 60 (CKK), a 9 months sentence was imposed. Defendant

Rivera posted on Facebook during his march to the Capitol, was told he

shouldn't be at the Capitol and proceeded anyway, he yelled to a nearby rioter

that he would "pull their asses out of there…this is the only f***** way." *See*

gov't sent memo ECF No. 69, p. 7. He continually mocked Capitol police days

after he came home from January 6. *Id*.

Last month, Judge Collyar Kotelly  sentenced Gabriel Chase on the class B

5104 parading charge and he received no jail time and a sentence of 36 months

probation.  *See USA v. Chase*, 23-0018(CKK). In this case, Mr. Chase was far

more of a bad actor than Mr. Neely. For example, Mr. Chase was directed by

officers to leave the Capitol, but he did not. Mr. Neely did. Mr. Chase pushed

past officers. Mr. Neely did not. He went into Nancy Pelosi's office. Mr. Neely

did not. He was part of a radicalized group called "America First." Mr. Neely

was not. Mr. Chase made it to the Senate chamber, yet did not go in. Mr. Neely

did not. Even after he left the Capitol, Mr. Chase went to the media equipment

area and engaged with others in destroying property. Mr. Neely did not. Yet, the

government asked for a sentence of merely 60 days. Mr. Chase was charged with the exact 4 misdemeanors Mr. Neely was, excluding the theft charge, yet Mr. Neely went to trial, Mr. Chase did not. And although his conviction is for a class B misdemeanor, Mr. Chase's conduct compared to Mr. Neely's is night and day. This Court should take that into account here.

Where a defendant pled to a class A misdemeanor charge, the following facts are stated and sentence imposed:

**United States v. Jenny Louise Cudd*, 21-cr-00068 (TFM) (sentenced to 2 months probation)(defendant wore a bullet proof sweatshirt, engaged in a push against law enforcement officers while yell "go" and "charge" and celebrated property destruction and lacked remorse) *See* ECF 90.

**United States v. Jennifer Ryan* 21-cr-00050(CRC)(sentenced to 2 months incarceration)(the defendant posted and live streamed her activity; she was "publicly cheerleading on a violent attack"(See ECF 48); she said the events were "a prelude to war" she shouted "fight for Trump" and "Hang Mike Pence"; she tweeted a photograph of a broken window that encouraged additional violence and she had no remorse;

**United States v. Scirica*, 21-cr-000457 (CRC) (sentenced to 15 days incarceration). Here, remarkably, the defense agreed with the government's 15 day recommendation of incarceration. The defendant was not remorseful, close to chamber where vote took place, close to police line, chanted USA at police, and directed the crowd inside the capitol. He also took photos and video of himself. See ECF 17.

**United States v.  Courtright*, 21-cr-00072 (CRC) (sentenced to 30 days incarceration)(the defendant went onto the Senate floor; picked up a "members only" sign and only returned it because an officer ordered her to; posted on social media that showed a complete lack of remorse; and chanted at a line of police officers "whose house, our house and USA, USA.").

Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.,* ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold": Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, Leffingwell struck both officers in the head. *Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. Id., p. 9. Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government sought a sentence of 27 months' incarceration. Id., p. 2. The Court imposed a sentence of six months' incarceration with credit for time served, followed by 24 months of supervised release.  Mr. Neely's conduct was nowhere near this.

Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021). Carrying a Confederate flag, Blair walked up to a police line outside the Capitol. He turned towards an officer and said, "What's up motherfucker, what's up, what's

up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the defendant jabbed him with a lacrosse stick. Id. A search incident to arrest recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair pled guilty to a § 231(a)(3) felony offense. This defendant was sentenced to five months' incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted as intended to inflict bodily injury or to threaten it.

All told, the facts of the offense conduct and characteristics of the defendants who garnered little or no incarceration  and were charged with only misdemeanors were starkly different than Mr. Neely's conduct and characteristics. His  culpability appears to be minimal in contrast with rioters who posted hateful messages, destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.

This Court should look to a spectrum of aggravating and mitigating factors,[14] to include: (1) whether, when, how the defendant entered the Capitol building; *through an open door after many others had breached the Capitol* (2) whether the defendant encouraged violence; *absolutely not. He was a follower, not a leader.* (3) whether the defendant encouraged property destruction; *none* (4) the defendant's reaction to acts of violence or destruction; *he live streamed some*

---

[14] This are factors then Chief Judge Howell implemented in her J6 cases.

*events*(5) whether during or after the riot, the defendant destroyed evidence; *none* (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; *A little over an hour*; (7) the defendant's statements on social media; Mr. Neely is a journalist this would include his show, which is starkly different than posting on Facebook or twitter as it's related to his job; Moreover, someone clearly hacked into his Twitter account because there was active tweeting while he was incarcerated;[15] (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; *cooperated at the Capitol and when initially questioned by the FBI and again later when he was arrested;* (9) whether the defendant demonstrated sincere remorse or contrition; and the defendant's conduct after January 6, 2021. *Yes, he has demonstrated sincere remorse for the activates at the Capitol that caused death and injury to many. Mr. Neely will be writing a letter to the Court which he will read in court at sentencing.* While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Rather, this Court should mete out a punishment commensurate with the behavior of Mr. Neely compared to other rioters that day.

## VI. CONCLUSION

---

[15] Katie Kamara testified at trial that she had the passwords to Mr. Neely's social media accounts on her computer.

Considering all the applicable factors the Court will consider,  Mr. Neely

respectfully moves this court to impose a sentence of  time served, 12 months

supervised release, 60 hours of community service,  and $500 restitution.  This

sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C.

§3553(a).  It would be a sentence in the best tradition of federal judicial discretion,

that would consider Mr. Neely as an individual and account for his unique failings

and positive attributes that, in the words of Justice Kennedy "sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue."  *Rita v. United States*,

551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct.

2053 (1996).

                          Respectfully submitted,

                   By:       /s/ *Kira A. West*

                         Kira Anne West
                         DC Bar No. 993523
                         712 H. St. N.E., Unit #509
                         Washington, D.C. 20005
                         Phone: 202-236-2042
                         kiraannewest@gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify on the 30th  day of August, 2023 a copy of same was

delivered to the parties of record pursuant to the  rules of the Clerk of Court.

*Kira West*            /S/
Kira Anne West